DAVID R. ONGARO, State Bar No. 154698
AMELIA D. WINCHESTER, State Bar No. 257928
ONGARO BURTT & LOUDERBACK LLP
595 Market St., Suite 610
San Francisco, CA  94105
Tel:  (415) 433-3900 Fax:  (415) 433-3950

LAWRENCE D. MURRAY, State Bar No. 77536
ROBERT C. STRICKLAND, State Bar No. 243757
MURRAY & ASSOCIATES
1781 Union Street
San Francisco, CA 94123
Tel: 415 673-0555 Fax: 415 928-4084

Attorneys for Plaintiffs Boris Y. Levitt
*et al.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORIS Y. LEVITT, CATS AND DOGS ANIMAL HOSPITAL, INC., TRACY CHAN, and BLEEDING HEART, LLC d/b/a BLEEDING HEART BAKERY; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YELP! INC.; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. CV 10-01321 MHP<br>Consolidated with CV 3:10-cv-02351MHP<br><br>**FIRST AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR:**<br><br>**(1)  VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200;**<br><br>**(2)  VIOLATION OF BUSINESS & PROFESSIONS CODE § 17500; and**<br><br>**(3)  INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**<br><br>*Jury Trial Demanded* |

Plaintiffs Boris Y. Levitt, d/b/a Renaissance Restoration, a/k/a Renaissance Furniture Restoration ("Levitt" or "Plaintiff"), Cats and Dogs Animal Hospital, Inc. ("Cats and Dogs" or "Plaintiff"), Tracy Chan, d/b/a Marina Dental Care, a/k/a Marina Dental Care ("Chan" or "Plaintiff" ), and Bleeding Heart, LLC d/b/a Bleeding Heart Bakery, on behalf of themselves and all others similarly situated, file this class action First Amended and Consolidated Complaint

(hereafter "FAC") against Defendant Yelp! Inc. ("Yelp" or "Defendant") and Does 1 through 100, inclusive.

**INTRODUCTION**

1.      Plaintiffs bring this action on behalf of themselves and other similarly situated businesses and persons in California and nationwide who were contacted by Yelp regarding the option to advertise on Yelp and who were subsequently subject to the manipulation of the reviews of their businesses during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit.  This class action challenges Defendant's unfair and unethical conduct in promoting, marketing, and advertising its website as maintaining nonbiased reviews, and Defendant's unfair and unlawful conduct directed towards businesses and their owners.

2.      Defendant's website allows users to post reviews of businesses.  Users are able to rank businesses using a star rating of one to five stars with five stars being the highest.  The business is then given an overall star rating based on the total number of user reviews. Defendant's website draws over 25 million people each month who are able to search for and review the public ratings of businesses.[1]

3.      Defendant's website represents that "Yelp is the fun and easy way to find, review, and talk about what's great – and not so great, in your area," that Yelp is "Real People. Real Reviews," and that its purpose is to "connect people with great local businesses."

4.      Defendant makes money by selling advertisements to local businesses.  Defendant advertises "Advertising on Yelp" by representing on its website that advertising allows a business to increase its exposure by the placement of advertisements above Yelp search results and on related business pages.  Yelp also advertises that an advertising subscription allows a business to enhance its business page with a photo slideshow and prevents similar businesses from advertising on the middle of the page.  Yelp further states on its website that "[p]aying advertisers can also promote a favorite review at the top of their Yelp page, but can never change or re-order other

_____

[1]/ Defendant's website states that "[a]s of December 2009, more than 26 million people visited Yelp in the past 30 days."

reviews." In addition, Defendant states that, "Yelp has an automated filter that suppresses a small portion of reviews –it targets those suspicious ones you see on other sites."

5.      Defendant maintains that reviews may only be removed from Yelp if: 1) A user removes the review; 2) Yelp removes the review for violating the Review Guidelines or Terms of Service; or 3) "The review may have been suppressed by Yelp's automated software system. This system decides how established a particular reviewer is and whether a review will be shown based on the reviewer's involvement on Yelp. While this may seem unfair to you, this system is designed to protect both consumers and businesses alike from fake reviews (i.e., a malicious review from a competitor or a planted review from an employee). The process is entirely automated to avoid human bias, and it affects both positive and negative reviews. It's important to note that these reviews are not deleted (they are always shown on the reviewer's public profile) and may reappear on your business page in the future."

6.      Defendant offers businesses advertising subscriptions for amounts ranging from $300 to $1,200 per month.

7.      Upon information and belief, once a business declines to purchase advertising, Yelp manipulates the reviews of the business.  Yelp will also manipulate the reviews of a business to induce the business and/or owner to sign up for advertising.

8.      Specifically, if a business declines an offer of advertising from Yelp, Yelp manipulates the overall rating of the business by removing positive reviews or adding negative reviews, which causes the business's overall star rating to fall.  As a result, fewer Yelp users view the business page and patronize the business, which causes a decrease in the revenues the business otherwise would have brought in.

9.      Due to Yelp's conduct, businesses purchase advertising to avoid Yelp's manipulation of the business's reviews.

10.      Upon information and belief, to further induce businesses to advertise, Yelp offers businesses the opportunity to manipulate reviews in exchange for the business's purchase of advertisements.  To ensure it receives positive reviews, a business owner pays for advertisements.

11.     Once a business's reviews are manipulated by Yelp, the business itself is impacted either by a loss of revenue or by the requirement of paying hundreds of dollars each month for advertising on Yelp to avoid Yelp's manipulations.

12.     As a result of Yelp's actions, Plaintiffs bring claims for violations of California Business and Professions Code sections 17200 and 17500 and intentional interference with prospective economic advantage.

## THE PARTIES

13.     Plaintiff Boris Levitt, a resident of San Mateo County, owns and operates a business called Renaissance Furniture Restoration, which is located in San Francisco, California.

14.     Plaintiff Tracy Chan, a resident of San Mateo County, owns and operates a business called Marina Dental Care, which is located in San Francisco, California.

15.     Plaintiff Cats and Dogs Animal Hospital, Inc. is a California corporation with its principal place of business in Long Beach.

16.     Plaintiff Bleeding Heart LLC, d/b/a Bleeding Heart Bakery is an Illinois limited liability corporation with its principal place of business in Chicago, Illinois.

17.     Defendant Yelp! Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Yelp is licensed to do, and is doing business in California and throughout the United States.  At all relevant times, Yelp offered its services to businesses and persons nationwide, and operated its business in California.

18.     Plaintiffs are unaware of the true names and capacities of DOES 1-100, inclusive, but are informed and believe, and thereon allege, that each of the DOE Defendants is responsible for the acts and obligations, and should be subject to and bound by the declarations and judicial determinations sought herein.  When Plaintiffs learn the true names and capacities of DOE Defendants, they will amend their FAC accordingly.

## VENUE AND JURISDICTION

19.     Jurisdiction and venue are proper in this Court as it was originally properly filed in the San Francisco County Superior Court because Defendant maintains its principal place of business in this county.  This matter was removed to the United States District Court for the

Northern District of California pursuant to 28 U.S.C § 1331 *et seq*.  This court maintains removal jurisdiction over the matter because it was removed pursuant to 28 U.S.C § 1331 *et seq*.

## GENERAL ALLEGATIONS

**Yelp's Business Model**

20.     At all relevant times, Defendant Yelp made its review and advertising services available to business owners nationwide.

21.     Upon information and belief, "Yelp.com," is a website developed, owned, maintained, altered, and operated by Defendant Yelp, as an internet application and website that utilizes Web 2.0 user-website interaction.

22.     "Yelp.com" consists of an online directory of businesses.  Each business listed on Yelp.com has a unique Yelp.com listing page, which provides basic business information and user-generated ratings and reviews.  Once a business listing is created, individuals registered on the "Yelp.com" website may rate and review the business.

23.     To rate and review businesses, internet users simply register on the Yelp.com website.  When logged into his or her personal profile, the registered user is able to view reviews he or she has posted even if Yelp's system has removed them from the public review page for the business.  Accordingly, the posting user may not realize that his or her review has been removed by Yelp.

24.      Any internet user (whether registered or not) can browse Yelp.com to find ratings and reviews of businesses.

25.     Ratings-based websites, including "Yelp.com," are highly popular have great power to direct the flow of commerce in a given area.

26.     Defendant Yelp's website contains language explicitly stating that user business reviews will only be removed as a result of user conduct or if an automated nonbiased software system removes the reviews.  Defendant's website also contains language explicitly stating that it will not remove negative reviews or move a review to the bottom of the webpage if a business pays for advertising.

27.     Businesses may not opt out of being listed on the "Yelp.com" website.

28.     Defendant Yelp allows businesses listed on the "Yelp.com" website to register for a free "Business Owner Account," which provides owners with:

    (a)    the ability to track how many people view their page;

    (b)    the ability to update business information (such as hours of operation); and

    (c)    a limited ability to send messages directly to a reviewer (for example, responding to a review), although reviewers can choose to disable this feature.

29.     Yelp further offers businesses with Yelp accounts the opportunity to designate the business under certain Yelp search categories, which allow Yelp users to search for the business under the applicable category.

**Yelp Advertising**

30.     Upon information and belief, the "Yelp.com" website's only stream of revenue is through the sale of advertisements on the "Yelp.com" website and Yelp's sales personnel are paid, in part, through commissions.

31.     Yelp refers to businesses that purchase advertising as Yelp "Sponsors."

32.     The term "Non-Sponsor" as used in this FAC, refers only to those businesses to which Yelp offered paid advertising subscriptions, but which declined to purchase any advertising.

33.     Non-Sponsors routinely see positive reviews disappear from their Yelp.com listing pages soon after declining to become a Yelp Sponsor.

34.     Non-Sponsors routinely see an increase in the number of negative reviews on their Yelp.com listing pages soon after declining to become a Yelp Sponsor.

35.     Sometimes such negative reviews are false.  Examples of false reviews are reviews that concern services or goods not offered by the business, or purporting to be from customers or patients who never patronized the business.

36.     Upon information and belief, such false negative reviews are sometimes generated by Yelp personnel or others who act on behalf of Yelp or at Yelp's direction, or who are compensated in some form by Yelp.

37. Although such false negative reviews violate Yelp's Terms of Service, Yelp regularly fails to remove such reviews for Non-Sponsors.

38. The decline of their Yelp.com rating and the posting of false negative reviews harms Non-Sponsors, which frequently see a drop in the number of customers patronizing their businesses, and a decrease in income and profits.

39. Yelp sales people represent to businesses that Yelp has the power to manipulate Yelp.com business listing pages, and that Yelp will yield that power in favor of the business if it becomes a Yelp Sponsor, and against the business if it declines to become a Yelp Sponsor.

40. The mere representation of the ability to manipulate page content is sufficient to instill in businesses the fear that, through such manipulation, the business will suffer if it elects not to become a Yelp Sponsor. Businesses frequently become Sponsors, not based on a cost-benefit analysis of the advertising, but simply because they fear the consequences of declining a Sponsorship.

41. Yelp in fact manipulates Yelp.com business listing pages in favor of Yelp Sponsors and detrimentally to Yelp Non-Sponsors, including by (a) relocating or removing negative reviews of Sponsors; (b) posting positive reviews of Sponsors and urging others members to do the same; (c) allowing Sponsors to choose the order in which reviews appear on their Yelp.com listing pages; (d) removing positive reviews of Non-Sponsors; (e) posting negative reviews of Non-Sponsors and urging others to do the same; and (f) enforcing Yelp's Terms of Service for Sponsors, but refusing to enforce Yelp's Terms of Service for Non-Sponsors.

**Plaintiffs' Experiences with Yelp**

### **Non-Sponsors**

### **Boris Levitt**

42. On or about May 13, 2009, Levitt contacted Yelp to inquire about why a positive review of his business had disappeared.

43. On or about May 13, 2009, "Kris" from Yelp User support wrote Levitt back and included the following explanation:

We decided early on that Yelp wasn't going to be another anonymous review site where everyone is given credibility whether they've earned it or not. We created an automated system that decides how much trust to instill in a particular reviewer. If the reviewer isn't involved with Yelp, it's awfully hard for our software to have much confidence in the reviewer and so it may not display that review. It's important to note that these reviews are not deleted (they are always shown on the reviewer's public profile) and may reappear on your business listing page in the future.  While this is may seem unfair to you, please know that this system is also in place to try to protect you from an untrustworthy review from a malicious competitor. While not perfect, we are committed to improving our site to keep Yelp useful for both consumers and businesses alike. We created a blog that explains our practices in more detail; please take a look here:
http://officialblog.yelp.com/2009/02/9-myths-about-yelp.html

44.     That same day, Levitt responded to the Yelp message, and requested that Yelp restore the positive review.  Levitt also noted that the customer who posted the review had inquired about why it had disappeared.

45.     Kris responded and included the following response:

Because the system is totally automated, unfortunately I don't have the ability to evaluate or reinstate specific reviews. However I will be sending your information to our engineering team so that they can make sure everything is working properly. They are always refining our system and sometimes it does misfire.  I'm sorry I can't be of more direct assistance but wanted you to know that we're taking your feedback to heart as we continue to improve the system.

46.     In July 2009, Levitt was contacted twice by phone by a female Yelp sales representative who wanted Levitt to purchase advertising from Yelp.

47.     During the second telephone conversation, the sales representative told Levitt that his business was doing very well on Yelp because in July alone his business had 261 Yelp page views, but that Levitt's business would have an even greater number of Yelp page views if Levitt paid Yelp at least $300.00 a month to advertise.  In response, Levitt told the sales representative that he felt that he did not need to advertise on Yelp because there was a high volume of users reviewing his business page, and his business had an overall rating of 4.5 stars.  Levitt also asked the sales representative if Yelp could restore the 5-star review that had disappeared during last several months.

48.     At the time Levitt was contacted by the sales representative, he had seven 5-star reviews, one 4-star review, and one 1-star review.

49.     Two days after Levitt's conversation with Yelp's employees – during which he declined to purchase advertising -- six out of the seven 5-star reviews were removed from his business page leaving Levitt with an overall star rating of 3.5 stars.  As a result, during the month of August, Levitt's business Yelp page received only 158 page views as opposed to the 261 page views Levitt's business experienced in July of 2009.  Since then, Levitt's business revenues experienced a decline that corresponded almost directly to the decline in page views.

50.     In addition, and following Levitt's decision not to purchase Yelp advertising, Yelp removed Levitt's business from the categories of services he had designated on his business account and restricted him to one category.  Upon information and belief, if Levitt had advertised with Yelp as a paying customer, the restriction would have been lifted.

51.     Since Levitt declined to purchase advertising from Yelp, every 5-star review that had been posted by Levitt's clients on his Yelp business page has been removed within 2-3 days after the Yelp user has posted his or her review of Levitt's services.  As of the filing of Plaintiff's original Complaint, ten out of eleven of the 5-star reviews had been removed from Levitt's business's Yelp review page.

### Plaintiff Cats and Dogs

52.     On September 12, 2009, Dr. Perrault, a veterinarian and the owner of Cats and Dogs, became aware of a negative review posted by "Chris R." on the Cats and Dogs Yelp.com listing page.

53.     Concerned about the review's defamatory language, possible falsity, and the adverse impact it could have on his business, Dr. Perrault cross-referenced the factual information alleged in the review with his client history.

54.     Upon finding that the review of Chris R. referenced a visit that occurred over 18 months prior to its posting (6 months outside of Yelp's 12-month policy), Javier Vargas, the Hospital Manager at Cats and Dogs, called Yelp on or around September 15, 2009, to request that the review be removed from the Yelp.com website for violating Yelp's review guidelines. The review was subsequently removed from the Cats and Dogs Yelp.com listing page.

55.     A second defamatory review, from "Kay K.," appeared on the Cats and Dogs Yelp.com listing page within five days of the "Chris R." review's removal. The review read:

> *The only reason I am even giving one star is because it wouldn't allow me to continue without it . . . otherwise, I would have given them no stars. Dr. Perrault is the rudest vet I've ever been to . . . probably one of the rudest people I've had the displeasure of meeting. I agree with the previous reviews about making you feel like an unfit mom. My pup had been sick and I had a theory on what the problem may have been and he wouldn't even entertain the idea, but instead, made me feel bad because my dog got sick. And, my poor dog was terrified of him! He made me feel like I was 2 inches tall and repeatedly looked down his nose at me. Oh, and OVER PRICED! OMG! Who does he think he is??? I did not feel welcomed by him nor his staff. I paid you for a service! No need to treat me so bad!*

56.     Soon after the appearance of these negative reviews, Dr. Perrault and Mr. Vargas began receiving frequent, high-pressure calls from Yelp sales representatives, who promised to manipulate Cats and Dogs' Yelp.com listing page in exchange for Cats and Dogs purchasing an advertising subscription.

57.     For example, on or about January 5, 2010, Cats and Dogs received a Yelp sales call from "Kevin."  Kevin said that Cats and Dogs could advertise with Yelp for a minimum payment of $300 per month, with a minimum 12-month commitment.  Kevin stated that if Cats and Dogs purchased a one-year advertising subscription from Yelp:

a.     Yelp would hide negative reviews on the Cats and Dogs Yelp.com listing page, or place them lower on the listing page so internet users "won't see" them;

b.     Yelp would ensure negative reviews will not appear in Google and other search engine results;

c.     Yelp would allow Cats and Dogs to decide the order that its reviews appear in on its Yelp.com listing page; and

d.     Cats and Dogs could choose its "tagline," i.e., the first few lines of a single review shown on every search result page in which Cats and Dogs appears (for instance, "Veterinarian in Long Beach").

58.     Dr. Perrault declined the offer, saying that he wanted to track referrals from Yelp for three months without ads, but might thereafter be willing to test Yelp's advertising potential.

59.     Within a week of declining Kevin's advertising offer, the negative review from Chris R. reappeared on the Cats and Dogs Yelp.com listing page.

60.     Soon after, "Kay K." posted a second negative review. This review was added on January 6, 2010, one day after Kevin's sales call:

> *I've already left one review about how bad a vet Dr. Perrault is, but I wanted to add something. I've been reading other people's reviews and I must have gone to a different Cats and Dogs Animal Hospital with a vet named Dr. Perrault. Oh wait, no . . . he's the only one. Maybe it's a Dr. Jeckyl / Mr. Hyde thing?! I don't know. But the guy's an @$$. No other way around it. He's a jerk, a D-Bag, And so arrogant. I ran in to him in a neighborhood store right after he saw my poor sick dog at his clinic and he looked right at me, recognized me, rolled his eyes and looked away!!!! Seriously, someone needs to knock this guy down to the size he really is. He needs to drop his Napolean complex and be a professional. After my horrible experience with him, I took my sick dog to Bixby Animal Clinic and I have never had a more pleasant vet experience! Go there instead! My dog loved everyone there! Sorry to rant, but I just wanted to get the word out there. Don't spend the money on this overpriced errogent vet. It's not worth it!*

61.     On or about January 12, 2010, Mr. Vargas contacted Yelp to protest the reappearance of the "Chris R." review and the highly negative, inflammatory "Kay K." reviews.

62.     On January 13, 2010, Mr. Vargas received via email the following response from Yelp:

> We wanted to let you know that we've taken a close look at the reviews by Chris R and Kay K, and after careful evaluation, we have decided to leave both intact. Because we don't have firsthand knowledge of a reviewer's identity or personal experience, we are not in a position to verify your claims that these reviewers are the same person, or that they are connected to the recent vandalism at your hospital. If a review appears to reflect the personal opinion and experiences of the reviewer while adhering to our review guidelines [link], it is our policy to allow the reviewer to stand behind his or her review.

63.     As of January 18, 2010 Cats and Dogs enjoyed a 4-star rating on its Yelp.com listing page.  Sixteen out of 26 reviews (over 60%) gave Cats and Dogs a perfect 5-star rating.  Despite this, as of January 18, 2010, a Yelp.com search for "veterinarian in Long Beach" displayed the following tagline for Dogs and Cats:

> *"Dr. Perrault is the most inept/rude veterinarian I have ever met. He had my rescue dog cowering and barking in the corner of the exam room within seconds of meeting him.  He berated me for 20 . . ."*

64.     Compare Cats and Dogs' tagline to the tagline (as of January 18, 2010) of Bixby Animal Clinic, a Long Beach veterinary business that is a Yelp Sponsor (and the same company the mysterious Kay K. referred users to in her second Cats and Dogs review):

> *"This place IS awesome. I brought my little man (Bruin) to Dr. A. as a puppy for the puppy package. They have great hours and were able to acommodate me AFTER work so I never had to take extra time . . . "*

65.     Cats and Dogs was damaged as a result of Yelp's actions, including through lost patronage and prospective business.

66.     Cats and Dogs' experience with Yelp was not unique, but rather typical of Yelp's advertisement sales tactics.

## SPONSORS

### Dr. Tracy Chan, DDS

67.     Dr. Tracy Chan is a licensed dentist.  Dr. Chan's office is located at 1767 Union Street in San Francisco where she has operated for the past 10 years.

68.     Prior to spring 2008, Dr. Chan's business's overall Yelp star-rating was approximately 4.5 or 5 five stars.  There were approximately 30 reviews on Dr. Chan's Yelp review page.

69.     In or around spring 2008, Dr. Chan started getting telephone calls from a Yelp representative named Quinn Zimmerman ("Zimmerman").  Zimmerman would call Dr. Chan frequently, offering her the opportunity to become a business sponsor.  Zimmerman told Dr. Chan that if she became a business sponsor (i.e., paid for advertising on Yelp), that Yelp could offer her lots of benefits, such as the opportunity to keep Dr. Chan's business ratings high by hiding or burying bad reviews, keeping positive reviews at the top of the Marina Dental Care Yelp page and negative reviews at the bottom of the page.  Further, Zimmerman indicated that Dr. Chan could put pictures on the Yelp page, and track and increase the number of page views per month.

70.     In addition to the benefits Zimmerman offered Dr. Chan, Zimmerman told her that although many Yelp reviews were manipulated by a computer system, Yelp employees also had

the ability to remove reviews from a business's Yelp page.

71.   Zimmerman offered Dr. Chan advertising for between $300-$500 per month.

72.   Approximately one month after Zimmerman first contacted Dr. Chan for advertising, Dr. Chan ultimately declined to purchase Yelp advertising from Zimmerman.

73.   Within 2-3 days of the time in which Dr. Chan told Zimmerman that she did not want to purchase advertising from Yelp, Yelp removed nine 5-star reviews from Dr. Chan's Yelp review page.  As a result, the rating of Marina Dental Care dropped from 5 stars to 3 stars.

74.   After months of experiencing a decline in new patients due to Marina Dental Care's overall 3-star rating, Dr. Chan felt compelled to sign up for advertising on Yelp.  On August 11, 2008, Dr. Chan signed a one-year contract with Yelp for advertising.  Within days, Marina Dental Care's overall star rating increased to 4 stars and various five star reviews were reinstated.

75.   In November 2008, Dr. Chan decided to cancel her Yelp advertising contract. Following the termination of her contract, Yelp removed positive reviews on the Marina Dental Care Yelp page and replaced them with negative reviews.

76.   In March 2009, after Yelp had – one again – removed several positive reviews, Chan attempted to post a negative review about Yelp to the Marina Dental Care Yelp page. Within two to three days, Yelp removed six positive reviews -- all of which were 4 or 5-star ratings -- from the Marina Dental Care Yelp page.  As a result, the Marina Dental Care overall Yelp star-rating fell to 3 stars.

77.   In May 2009, Chan wrote a letter to Yelp, which described her experiences.  In response, Yelp removed additional positive ratings from the Marina Dental Care Yelp page and the Marina Dental Care overall star rating fell to 2.5 stars.

78.   As a result of Yelp's manipulation of the Marina Dental Care reviews, Marina Dental Care experienced a decline in new patients that corresponded almost directly to the decline in Yelp star ratings.

**Plaintiff Bleeding Heart Bakery**

79.   Bleeding Heart Bakery has two locations in Chicago. Each location has a separate Yelp.com listing page.

80.     Beginning in 2007, Yelp began calling Michelle Garcia, Bleeding Heart Bakery's owner and operator, including on her personal cell phone, trying to get Ms. Garcia to purchase a Yelp advertising subscription on behalf of the Bleeding Heart Bakery.

81.     On one or more occasions on these phone calls, Ms. Garcia pointed out that some reviews of the Bleeding Heart Bakery were demonstrably "bogus." For example, a review purported to describe an experience that occurred on a day that Bleeding Heart Bakery was closed.

82.     A Yelp sales person calling Ms. Garcia promised that, if she agreed to purchase an advertising subscription, Yelp would push bad reviews to the very end of Bleeding Heart Bakery's Yelp.com listing pages, and that the sales representative would personally remove the "bogus" reviews Ms. Garcia complained of.

83.     Yelp further promised Ms. Garcia that, as a Yelp Sponsor, she would be allowed to choose her favorite ten reviews, which would always appear at the top of Bleeding Heart Bakery's Yelp.com listing pages.

84.     Yelp further promised Ms. Garcia that, as a Yelp Sponsor, she could choose which pictures uploaded by reviewers would appear on Bleeding Heart Bakery's Yelp.com listing pages, and which would be removed.

85.     Based on these promises, in November 2008 Ms. Garcia agreed to purchase an advertising subscription from Yelp. Although Yelp had urged her to purchase a sponsorship for just one of the Bleeding Heart Bakery's Yelp.com listing pages for $500 per month, Ms. Garcia eventually negotiated a deal that would cover both of the Bleeding Heart Bakery's Yelp.com listing pages for $600 per month. The term of the contract was one year. Ms. Garcia paid the first month's charge by credit card, and Yelp automatically charged subsequent months to her credit card on a monthly basis.

86.     At the time Bleeding Heart Bakery became a Yelp Sponsor, the company enjoyed a 4-star Yelp rating.

87.     During the same month that Bleeding Heart Bakery became a Yelp Sponsor, six negative reviews of the business were posted by Yelp Elite Squad members.[2]  Some of the reviews contained personal attacks. During the same time, several 4-star reviews disappeared from Bleeding Heart Bakery's Yelp.com listing page.

88.     As a result of the new negative reviews and disappearing positive reviews, Bleeding Heart Bakery's rating dropped to 3.5 stars.

89.     As a result of these negative reviews, Bleeding Heart Bakery's business suffered. For example, during a week following the posting of these negative reviews by Yelp Elite Squad members, Bleeding Heart Bakery went from typical sales of 300 cupcakes per week, to just 24 cupcakes, and was forced to throw out the remainder of its inventory.

90.     When Ms. Garcia called Yelp to complain about the reviews, including the personal attacks, Yelp told her that if she became a "premier" advertiser—at a higher cost—Yelp would talk to the Yelp Elite Squad and "ask them to give the business another shot."

91.     Yelp further told Ms. Garcia said that if Bleeding Heart Bakery increased the amount of its advertising subscription to become a "premier" advertiser, Yelp would bring Bleeding Heart Bakery's star rating back up.

92.     Bleeding Heart Bakery's experience with Yelp was not unique, but rather typical of Yelp's advertisement sales tactics.

---

[2]/ The Yelp Elite Squad is comprised of individuals Yelp touts as "the most passionate Yelpers," who Yelp says it wants to recognize and reward for being active on the site. Individuals must apply to become Elite Squad members.  The primary benefit of becoming a Yelp Elite Squad member is receiving frequent invitations to free Yelp Sponsored Events.  A Yelp Elite Squad member is identified on Yelp with an "Elite" badge adjacent to the member's name and photo in the member's reviews and on the member's profile home page.

**Other Businesses and Persons' Experiences with Yelp**

93.     Upon information and belief, Defendant manipulated the reviews for hundreds of other businesses after a person or business spoke to a Yelp customer service representative about advertising on Yelp.[3]

## CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

95.     The subclasses that Plaintiffs seek to represent are defined as follows:

a)   All similarly situated businesses and persons in California and nationwide who were in contact with Yelp regarding the option to advertise on Yelp, declined to purchase advertising, and who were subsequently subject to the manipulation of the reviews of their businesses during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit ("**Non Sponsors**").

b)   All similarly situated businesses and persons in California and nationwide who were in contact with Yelp regarding the option to advertise on Yelp, purchased advertising, and who were subsequently subject to the manipulation of the reviews of their businesses during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit ("**Sponsors**").

96.     This action has been brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

97.     Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

_____

[3]/ Many stories have been published that describe similar allegations relating to Yelp's conduct.  *See e.g., Yelp and the Business of Extortion 2.0, available at* http://www.eastbayexpress.com/eastbay/yelp-and-the-business-of-extortion-20/Content?oid=1176635.

98.     Numerosity:  The Class is so numerous and geographically dispersed that joinder of all Class members is impracticable.  Upon information and belief, there are hundreds if not thousands of similarly situated individuals nationwide.

99.     Commonality:  This action presents questions of law and fact common to the members of the Class which predominate over questions affecting individual members of the Class, such questions of law or fact include, but are not limited to:

a)      Whether Defendant unfairly and unlawfully manipulated the reviews of businesses of Plaintiffs and the Class, in violation of California Business & Professions Code § 17200 *et seq.*;

b)      Whether Defendant made deceptive statements and misrepresentations directly to businesses and through its advertising regarding the purchase of Yelp advertising in violation of California Business & Professions Code § 17500 e*t seq.*; and

c)      Whether Defendant intentionally interfered with prospective economic advantage.

100.    Typicality:  Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs have no interests that are adverse or antagonistic to the interests of the other members of the Class.

101.    Adequacy of Representation:  Plaintiffs will fairly and adequately protect the interests of the other members of the Class.  Plaintiffs are committed to prosecuting this Class Action and have retained competent counsel experienced in litigation of this nature.

102.    Superiority of Class Action:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all Class Members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.  Class members have been damaged and are entitled to recovery by reason of Defendants' unfair business practices, misleading advertisements, and misrepresentations.  Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

## FIRST CAUSE OF ACTION

(Violation of Business & Professions Code § 17200 *et seq.*)

(Plaintiffs in Subclasses (a) and (b) v. Defendant)

103.    Plaintiffs incorporate by reference paragraphs 1 through 102 inclusive, as though fully set forth herein.

104.    Plaintiffs assert this cause of action on behalf of themselves and the Class.

105.    California Business & Professions Code § 17200 *et seq.* prohibits unfair competition that is any unfair, unlawful or a fraudulent business practice.

106.    Defendant made deceptive statements and misrepresentations on its website and through its employees regarding the purchase of advertising and Yelp's manipulation of reviews.

107.    Plaintiffs, relying on Yelp's representations, either purchased or declined to purchase advertising from Yelp.

108.    Defendant offered to or did in fact manipulate the reviews of businesses immediately prior to or following the offer of advertising to each of the Class members in violation of public policy.

109.    Defendant unlawfully attempted to and or did in fact commit extortion by unlawfully using fear (the removal of positive reviews or the addition of negative reviews) to induce the Class members to pay for advertising on Yelp.

110.    The harm to Class members caused by Defendant's conduct outweighs any benefits to Defendant.

111.    Accordingly, Defendant has violated Cal. Bus. & Prof. Code § 17200 *et seq.*, proscription against engaging in unfair and unlawful business practices.

112.    Plaintiffs and the Class members belonging to the Non-Sponsor Subclass (a) suffered injury in fact by lost business revenues.   Due to Defendant's manipulation of their business reviews after they declined to purchase advertising, the Class members lost revenue they otherwise would have received and as such, they are entitled to injunctive relief.

113.    Plaintiffs and the Class members belonging to the Sponsor Subclass (b) are entitled to equitable and injunctive relief in the form of restitution and disgorgement of all earnings,

profits, compensation and benefits Defendants obtained as a result of such unfair and unlawful business practices.  Defendant has been unjustly enriched by receiving substantial monies and profits from advertisements paid for by Plaintiffs and the Class hoping to avoid negative manipulations of their reviews.

114.    Both Plaintiffs and the Class have been deprived of money, either in the form of lost revenues or in payments made to Defendant for advertising, as a result of Defendant's wrongful conduct and unlawful acts and practices.  Plaintiffs and the Class members, therefore, have sustained injury in fact.

115.    Plaintiffs and members of the Class seek a court order requiring Defendant to immediately cease such violations of consumer protection and unfair competition statutes and enjoining them from continuing to deceptively advertise or conduct business via the unlawful or unfair business acts and practices and deceptive and misleading advertising complained of herein.

116.    Plaintiffs additionally request an order requiring Defendant to disgorge its ill-gotten gains as described above and awarding Plaintiffs and Class members belonging to Subclass (b) who purchased advertising full restitution of all monies wrongfully acquired by Defendant by means of such unlawful business practices, acts of unfair competition and false advertising, plus interest and attorney fees so as to restore any and all monies to Plaintiffs and the Class that were acquired and obtained by means of such deceptive, unfair, or unlawful business practices.

117.    These violations serve as unlawful predicate acts for purposes of Business and Professions Code § 17200, and remedies are provided therein under Business & Professions Code § 17203.

## SECOND CAUSE OF ACTION

(Violation of Business & Professions Code § 17500 *et seq*.)

(Plaintiffs in Subclasses (a) and (b) v. Defendant)

118.    Plaintiffs incorporate by reference paragraphs 1 through 117 inclusive, as though fully set forth herein.

119.    Plaintiffs assert this cause of action on behalf of themselves and the Class.

120.     California Business & Professions Code § 17500 *et seq.* prohibits the use of false advertising and misleading public disseminations while intending to dispose of real property or perform services.

121.     Upon information and belief, Defendant made deceptive statements and misrepresentations to business owners and through its website regarding the purchasing of advertising subscriptions.  Specifically, Defendant represented that by purchasing advertising, a business owner's Yelp reviews would only result in increased exposure and the ability to enhance a business page, and were not connected to the manipulation of reviews.

122.     As a result of Defendant's practices, Plaintiffs and the Class lost money in the form of advertising costs they were forced to pay to Defendant or lost revenues due to Defendant's manipulation of their reviews.

123.     Accordingly, Defendant has violated Cal. Bus. & Prof. Code § 17500 *et seq.*, proscription against using false and misleading statements while intending to dispose of services.

124.     Class members belonging to Subclass (a) who suffered lost revenues -- which they would have otherwise received -- due to Defendant's manipulation of their business reviews after they declined to purchase advertising are entitled to injunctive relief.

125.     Class members belonging to Subclass (b) who paid for Yelp advertising are entitled to equitable and injunctive relief in the form of restitution and disgorgement of all earnings, profits, compensation and benefits Defendant obtained as a result of such unfair and unlawful business practices.

126.     As a result of the conduct described above, Defendant has been and will be unjustly enriched at the expense of Plaintiffs and the Class members who purchased advertising. Specifically, Defendant has been unjustly enriched by receiving substantial monies and profits in advertising costs received as a result of its unfair and unlawful business practices.

127.     Further, both Plaintiffs and the Class have been deprived of money as a result of Defendant's wrongful conduct and unlawful acts and practices and, therefore, have sustained injury in fact.

128.     Plaintiffs and members of the Class seek a court order requiring Defendant to immediately cease such violations of consumer protection and unfair competition statutes and enjoining it from continuing to deceptively advertise or conduct business via the unlawful or unfair business acts and practices and deceptive and misleading advertising complained of herein.

129.     Plaintiffs additionally request an order requiring Defendant to disgorge its ill-gotten gains as described above and awarding Plaintiffs and the Class Members who purchased advertising full restitution of all monies wrongfully acquired by Defendant by means of such unlawful business practices, acts of unfair competition and false advertising, plus interest and attorney fees so as to restore any and all monies to Plaintiffs and the Class which were acquired and obtained by means of such deceptive, unfair or unlawful business practices.

### THIRD CAUSE OF ACTION

### Intentional Interference With Prospective Economic Advantage

(Plaintiffs in Subclass (b) v. Defendant)

130.     Plaintiffs incorporate by reference paragraphs 1 through 129 inclusive, as though fully set forth herein.

131.     There existed economic relationships between the Non-Sponsor Plaintiffs and Non-Sponsor Subclass (b) Class members, and third parties, with the probability of future economic benefit to the Non-Sponsor Plaintiffs and Non-Sponsor Class Members.

132.     Yelp knew of these relationships.

133.     Yelp intentionally committed wrongful acts designed to disrupt those relationships.

134.     The conduct – as described above – was independently wrongful.

135.     Those relationships were actually disrupted.

136.     The Class members suffered economic harm proximately caused by Yelp's acts.

### PRAYER FOR RELIEF

**WHEREFORE**, as a result of the foregoing, Plaintiffs pray for relief as follows:

1.     Declaring this action to be a proper class action maintainable under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), certifying appropriate subclasses and certifying Plaintiffs as Class Representatives;

2.     Enjoining Defendant from conducting its business through the unlawful acts and practices described in this Complaint;

3.     Requiring Defendant to disgorge its ill-gotten gains, as appropriate;

4.     Awarding restitution, as appropriate;

5.     Awarding pre- and post-judgment interest;

6.     Damages suffered as a result of Yelp's acts, in an amount to be determined at trial and punitive damages;

7.     Awarding Plaintiffs all costs and expenses, including attorneys' fees, including fees permitted under Cal. Code Civ. Proc. § 1021 *et seq.*; and

8.     Granting such other and further relief as this Court may deem necessary, proper, and/or appropriate.

DATED:  September 23,  2010       **ONGARO BURTT & LOUDERBACK LLP**


By: <u>*/s/ David R. Ongaro*</u>
     David R. Ongaro
     Attorneys for Plaintiff Boris Y. Levitt *et al.*