DAVID R. ONGARO, State Bar No. 154698
AMELIA D. WINCHESTER, State Bar No. 257928
ONGARO BURTT & LOUDERBACK LLP
595 Market St., Suite 610
San Francisco, CA  94105
Tel:  (415) 433-3900 Fax:  (415) 433-3950

LAWRENCE D. MURRAY, State Bar No. 77536
ROBERT C. STRICKLAND, State Bar No. 243757
MURRAY & ASSOCIATES
1781 Union Street
San Francisco, CA 94123
Tel: 415 673-0555 Fax: 415 928-4084

Attorneys for Plaintiffs Boris Y. Levitt
*et al.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORIS Y. LEVITT D/B/A RENAISSANCE RESTORATION, CATS AND DOGS ANIMAL HOSPITAL, INC., TRACY CHAN D/B/A MARINA DENTAL CARE and PROFESSIONAL CONSTRUCTION GROUP, INC. D/B/A PAVER PRO; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YELP! INC.; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. CV 10-01321 MHP<br>Consolidated with CV 3:10-cv-02351MHP<br><br>**SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200**<br><br>*Jury Trial Demanded* |

Plaintiffs Boris Y. Levitt, d/b/a Renaissance Restoration, a/k/a Renaissance Furniture Restoration ("Levitt" or "Plaintiff"), Cats and Dogs Animal Hospital, Inc. ("Cats and Dogs" or "Plaintiff"), Tracy Chan, d/b/a Marina Dental Care, a/k/a Marina Dental Care ("Chan" or "Plaintiff" ) and Professional Construction Group, Inc.  d/b/a  Paver Pro ("Paver Pro") on behalf of themselves and all others similarly situated, file this class action Second Amended and Consolidated Complaint (hereafter "SAC") against Defendant Yelp! Inc. ("Yelp" or "Defendant") and Does 1 through 100, inclusive.

## **INTRODUCTION**

1.      Plaintiffs bring this action on behalf of themselves and other similarly situated businesses and persons nationwide who were subject to extortion and/or attempted extortion by Defendant to obtain payments for advertising during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit.  This class action challenges Defendant's unfair and unlawful conduct – in violation of California's Unfair Competition Laws – directed towards businesses and their owners.

2.      Defendant's website allows users to post reviews of businesses.  Users are able to rank businesses using a star rating of one to five stars with five stars being the highest.  Defendant then gives the business an overall star rating based on some of the reviews.  Upon information and belief, the overall star rating of some businesses is based on reviews that Defendant has posted. Defendant's website draws over 25 million people each month who are able to search for and review the public ratings of businesses.[1]

3.      Defendant's website represents that "Yelp is the fun and easy way to find, review, and talk about what's great – and not so great, in your area," that Yelp is "Real People. Real Reviews," and that its purpose is to "connect people with great local businesses."

4.      Defendant, however, actually makes money by selling advertisements to businesses located throughout the country.  Contrary to the representations Defendant makes to the general public, a business's reviews are often connected to whether a business advertises with Defendant.

5.      Defendant states on its website that advertising allows a business to increase its exposure by the placement of advertisements above Yelp search results and on related business pages.  Yelp also states that an advertising subscription allows a business to enhance its business page with a photo slideshow and prevents similar businesses from advertising on the middle of the page.  Yelp further states on its website that "[p]aying advertisers can also promote a favorite review at the top of their Yelp page, but can never change or re-order other reviews."  In addition,

---

[1]/ Defendant's website states that "[a]s of December 2009, more than 26 million people visited Yelp in the past 30 days."

Defendant states that, "Yelp has an automated filter that suppresses a small portion of reviews –it targets those suspicious ones you see on other sites."  Defendant offers businesses advertising subscriptions for amounts ranging from $300 to $1,200 per month.

6.     Defendant maintains that reviews may only be removed from Yelp if: 1) A user removes the review; 2) Yelp removes the review for violating the Terms of Service or Content Guidelines; or 3)  "The review may have been suppressed by Yelp's automated software system. This system decides how established a particular reviewer is and whether a review will be shown based on the reviewer's involvement on Yelp. While this may seem unfair to you, this system is designed to protect both consumers and businesses alike from fake reviews (i.e., a malicious review from a competitor or a planted review from an employee). *The process is entirely automated to avoid human bias,* and it affects both positive and negative reviews. It's important to note that these reviews are not deleted (they are always shown on the reviewer's public profile) and may reappear on your business page in the future"  [collectively "**Yelp Review Terms**"] (emphasis added).[2]

7.     Upon information and belief, Yelp will manipulate the reviews of businesses nationwide to instill fear in businesses that if they do not purchase advertising, Yelp will manipulate their reviews – in a manner that does not comply with its Review Terms  –  so that for example: 1) Positive reviews are "removed" or "filtered"; 2) negative reviews are suddenly posted, sometimes, upon information and belief, by Yelp itself; 3) negative reviews are posted by users even though the reviews do not comply with the Yelp Terms and Conditions; 4) a business is unable to designate itself in categories for Yelp users to search; or 5) negative reviews, which were previously filtered, are sometimes revealed for reasons unrelated to the automated review filter.  Upon information and belief, Yelp's manipulation of reviews – in a manner that does not

---

[2]/ Since the filing of this lawsuit, Yelp has permitted website users to see filtered reviews, however, website users must click on a separate link and type in a code to do so.  The filtered reviews do not impact the overall star rating that Yelp lists for the business.  Thus, upon information and belief, Yelp can edit the overall star rating a business receives by manually filtering (or un-filtering) reviews.

comply with its own Review Terms – is done strategically to induce business owners to pay for advertising with Yelp.

8.      Upon information and belief, Yelp knows that when a business's overall star rating declines or the business has negative reviews, the business itself suffers, and that therefore a business fears the posting of negative reviews or the removal of positive reviews on its Yelp review page.  Yelp intentionally – either implicitly or explicitly – threatens businesses by using this fear to force businesses to agree to pay for advertising on Yelp.

9.      Due to Yelp's conduct, businesses and/or their owners who fear facing a negative drop in the overall star rating and/or positive reviews of their businesses agree to purchase advertising to avoid Yelp's manipulation of the business's reviews.  Those businesses are injured by the loss of money they are forced to pay Yelp in advertising costs.

10.      Upon information and belief, as a result of Yelp's review manipulations – in a manner that does not comply with its Review Terms – the businesses who decline to purchase advertising have negative reviews, which otherwise would not have been posted on the Yelp review page, attached to their businesses.  In addition, and upon information and belief, positive reviews are also removed.  As a result, fewer Yelp users view the business page and fewer existing customers patronize the business, which causes a decrease in the business's revenues.  Therefore, the businesses that do not purchase advertising are injured – as a result of Defendant's conduct – by a loss of sales, revenues and/or assets.  In addition, due to the posting of negative reviews and/or removal of positive reviews, the business's reputation is injured.

11.      As a result of Yelp's actions, Plaintiffs bring a claim for a violation of California Business and Professions Code section 17200 for unfair and unlawful conduct by Defendant.

## THE PARTIES

12.      Plaintiff Boris Levitt, a resident of San Mateo County, owns and operates a business called Renaissance Furniture Restoration, which is located in San Francisco, California.

13.      Plaintiff Tracy Chan, a resident of San Mateo County, owns and operates a business called Marina Dental Care, which is located in San Francisco, California.

14. Plaintiff Cats and Dogs Animal Hospital, Inc. is a California corporation with its principal place of business located in Long Beach, California.

15. Plaintiff Professional Construction Group, Inc., d/b/a Paver Pro, is a California corporation with its principal place of business located in Hayward, California.

16. Defendant Yelp! Inc. ("Yelp") is a Delaware corporation with its principal place of business located in San Francisco, California. Yelp is licensed to do, and is doing business in California and throughout the United States. At all relevant times, Yelp offered its services to businesses and persons nationwide and operated its business in California.

17. Plaintiffs are unaware of the true names and capacities of DOES 1-100, inclusive, but are informed and believe, and thereon allege, that each of the DOE Defendants is responsible for the acts and obligations, and should be subject to and bound by the declarations and judicial determinations sought herein. When Plaintiffs learn the true names and capacities of DOE Defendants, they will amend their SAC accordingly.

## **VENUE AND JURISDICTION**

18. Jurisdiction and venue are proper in this Court as it was originally properly filed in the San Francisco County Superior Court because Defendant maintains its principal place of business in this county. This matter was removed to the United States District Court for the Northern District of California pursuant to 28 U.S.C § 1331 *et seq.* This court maintains removal jurisdiction over the matter because it was removed pursuant to 28 U.S.C § 1331 *et seq.*

## **GENERAL ALLEGATIONS**

**Yelp's Business Model**

19. At all relevant times, Defendant Yelp made its review and advertising services available to business owners nationwide.

20. Upon information and belief, "Yelp.com," is a website developed, owned, maintained, altered, and operated by Defendant, as an internet application and website that utilizes Web 2.0 user-website interaction.

21.     "Yelp.com" consists of an online search engine and directory of businesses.  Each business listed on Yelp.com has a unique Yelp.com listing page, which provides basic business information and user-generated ratings and reviews.  Once a business listing is created, individuals registered on the "Yelp.com" website may rate and review the business.

22.     To rate and review businesses, internet users simply register on the Yelp.com website.  When logged into his or her personal profile, the registered user is able to view reviews he or she has posted even if Yelp has removed them from the public review page for the business.  Accordingly, the posting user may not realize that his or her review has been removed by Yelp.

23.     Any internet user (whether registered or not) can browse Yelp.com to find ratings and reviews of businesses.

24.     Ratings-based websites, including "Yelp.com," are highly popular and have great power to direct the flow of commerce in a given area.  Due to their widespread usage, a business's reputation is often connected to the reviews it receives on a ratings-based website.

25.     Businesses may not opt out of being listed on the "Yelp.com" website.

26.     Defendant allows businesses listed on the "Yelp.com" website to register for free "Business Owner Accounts," which provides owners with: 1) the ability to track how many people view their page; 2) the ability to update business information (such as hours of operation); and 3) a limited ability to send messages directly to a reviewer.

27.     Yelp further offers businesses with Yelp Business Owner Accounts the opportunity to designate the business under certain Yelp search categories.  Yelp users can then search for the business under the applicable category.

**Yelp Advertising**

28.     Upon information and belief, the "Yelp.com" website's only stream of revenue is from the sale of advertisements on the "Yelp.com" website and Yelp's sales personnel are paid, in part, through commissions.

29.     Yelp refers to businesses that purchase advertising as Yelp "Sponsors."

30.     The term "Non-Sponsor" as used in this SAC, refers only to those businesses to which Yelp offered paid advertising subscriptions, but which declined to purchase any advertising.

31.     Non-Sponsors routinely see positive reviews disappear from their Yelp.com listing pages soon after declining to become a Yelp Sponsor.

32.     Non-Sponsors routinely see an increase in the number of negative reviews on their Yelp.com listing pages soon after declining to become a Yelp Sponsor.

33.     Sometimes such negative reviews are false.  Examples of false reviews are reviews that concern services or goods not offered by the business, or purporting to be from customers or patients who never patronized the business.

34.     Upon information and belief such false negative reviews are sometimes generated by Yelp personnel or others who act on behalf of Yelp or at Yelp's direction, or who are compensated in some form by Yelp.

35.     Although such false negative reviews violate Yelp's Terms of Service, Yelp regularly fails and refuses to remove such reviews for Non-Sponsors.

36.     The decline of their Yelp.com rating and the posting of false negative reviews harms Non-Sponsors.  Non-Sponsors frequently see a drop in the number of customers patronizing their businesses, and a decrease in income and profits.

37.     To coerce businesses to advertise with Yelp, Yelp sales people – either implicitly or explicitly – represent to businesses that Yelp has the power to manipulate Yelp.com business listing pages, and that Yelp will yield that power in favor of the business if it becomes a Yelp Sponsor and against the business if it declines to become a Yelp Sponsor.

38.     The mere representation of the ability to manipulate page content is sufficient to instill in businesses the fear that, through such manipulation, the business will suffer if it elects not to become a Yelp Sponsor.  Businesses frequently become Sponsors, not based on a cost-benefit analysis of the advertising, but simply because they fear the consequences of declining a Sponsorship.

39.     Yelp in fact manipulates Yelp.com business listing pages in favor of Yelp Sponsors and detrimentally to Yelp Non-Sponsors by (a) relocating or removing negative reviews of Sponsors; (b) posting positive reviews of Sponsors and urging others to do the same; (c) allowing Sponsors to choose the order in which reviews appear on their Yelp.com listing pages; (d) removing positive reviews of Non-Sponsors; (e) posting negative reviews of Non-Sponsors and urging others to do the same; and (f) enforcing Yelp's Terms of Service for Sponsors, but refusing to enforce Yelp's Terms of Service for Non-Sponsors.

40.     By manipulating the overall star rating of businesses, Yelp itself provides information and content posted on its website (namely the overall star rating of a business) because the overall star rating of a business does not represent the reviews posted by third-party users.  Upon information and belief, Yelp drafts the content of some reviews, either through its employees or through its Yelp Elite members or other agents – with malice to induce businesses to advertise – which also impacts the reviews of businesses.

**Plaintiffs' Experiences with Yelp**

**Non-Sponsors**

**Boris Levitt**

41.     Levitt owns a business called Renaissance Furniture Restoration.

42.     Levitt did not voluntarily list his business on Yelp.com.

43.     In early 2008, Levitt signed up for a free business account on Yelp.com.  After doing so, Levitt's business received several positive reviews and one negative review on Yelp.com.  In early May 2009, several of the positive Yelp reviews disappeared from Levitt's business's review page causing the overall star rating of Levitt's business to decline.

44.     On or about May 13, 2009, Levitt contacted Yelp to inquire about why a positive review of his business had disappeared.   Levitt subsequently exchanged several emails with "Kris" from Yelp User support, who indicated that she could not assist him in removing the review, but that she would send his request to the Yelp engineering team to review.

45.     In July 2009, Levitt was contacted twice by phone by a female Yelp sales representative who wanted Levitt to purchase advertising from Yelp.

46.     During the second telephone conversation, the sales representative told Levitt that his business was doing very well on Yelp because in July alone his business had 261 Yelp page views, but that Levitt's business would have an even greater number of Yelp page views if Levitt paid Yelp at least $300.00 a month to advertise.  In response, Levitt told the sales representative that he felt that he did not need to advertise on Yelp because there was a high volume of users reviewing his business page, and his business had an overall rating of 4.5 stars.  Levitt also asked the sales representative if Yelp could restore the 5-star reviews that had disappeared during last several months.

47.     At the time Levitt was contacted by the sales representative, he had seven 5-star reviews, one 4-star review, and one 1-star review.

48.     Two days after Levitt's conversation with Yelp's employees – during which he declined to purchase advertising – six out of the seven 5-star reviews were removed from his business page leaving Levitt with an overall star rating of 3.5 stars.  As a result, during the month of August, Levitt's business Yelp page received only 158 page views as opposed to the 261 page views Levitt's business experienced in July of 2009.  Levitt's monthly income – which correlated almost directly to the page views Levitt's Yelp review page received – declined in response.

49.     Upon information and belief, Yelp manipulated the reviews of Levitt's business because he did not purchase advertising as a threat and with the intent to instill fear in Levitt that he needed to purchase advertising to avoid a further decrease in the positive reviews posted about his business.

50.     Since then, and as a result of Yelp's manipulations, Levitt's business revenues experienced a decline that corresponded almost directly to the decline in page views.  Due to the decline in the average or overall star rating of his business, the reputation of Levitt's business also suffered as result of Yelp's manipulations.

51.     To increase his overall star rating, Levitt attempted to contact the user who posted the one-star review.  While the user did not respond when Levitt contacted her through Yelp's messaging system, when contacted via Facebook, the user immediately removed the one-star review.  Upon information and belief, Yelp blocked Levitt's communications with the user to ensure that he would continue to fear that if he did not advertise, his overall star rating would remain low.

52.     In addition, in March 2010, Yelp removed Levitt's business from the multiple categories of services he had designated on his business account and restricted him to one category.  Upon information and belief, the category restriction was to further induce Levitt to pay Yelp for advertising, and if Levitt had advertised with Yelp, the restriction would have been lifted.

53.     Since Levitt declined to purchase advertising from Yelp, every 5-star review posted on Levitt's Yelp business page was removed within 2-3 days after the Yelp user posted his or her review of Levitt's services.  As of the filing of Plaintiff's original Complaint, ten out of eleven of the 5-star reviews had been removed from Levitt's business's Yelp review page.  Upon information and belief, Yelp repeatedly removed positive reviews from Levitt's business Yelp review page to instill fear in him that if he did not pay Yelp to advertise, that Yelp would cause his business's overall star rating to remain low.

54.     As a result of Yelp's conduct, fewer Yelp users viewed Levitt's business's Yelp page and fewer customers patronized his business, which caused a decrease in Levitt's business revenues.  Therefore, Levitt was injured – as a result of Defendant's conduct – by a loss of sales, revenues and/or assets.  In addition, due to the posting of negative reviews and/or removal of positive reviews, Levitt's business's reputation was injured.

**Plaintiff Cats and Dogs**

55.     Dr. Perrault is a veterinarian and the owner of Cats and Dogs, which is located in Long Beach, California.

56.     Dr. Perrault did not voluntarily list his business on Yelp.com.

57.     On September 12, 2009, Dr. Perrault became aware of a negative review posted by "Chris R." on the Cats and Dogs Yelp.com listing page.

58.     Concerned about the review's language, possible falsity, and the adverse impact it could have on his business, Dr. Perrault cross-referenced the factual information alleged in the review with his client history.

59.     Upon finding that the review of Chris R. referenced a visit that occurred over 18 months prior to its posting (6 months outside of Yelp's 12-month policy), Javier Vargas, the Hospital Manager at Cats and Dogs, called Yelp on or around September 15, 2009, to request that the review be removed from the Yelp.com website for violating Yelp's review guidelines.

60.     Yelp subsequently removed the review from the Cats and Dogs Yelp.com listing page.

61.     A second negative review, from "Kay K.," appeared on the Cats and Dogs Yelp.com listing page within five days of the "Chris R." review's removal. The review read:

> *The only reason I am even giving one star is because it wouldn't allow me to continue without it . . . otherwise, I would have given them no stars. Dr. Perrault is the rudest vet I've ever been to . . . probably one of the rudest people I've had the displeasure of meeting. I agree with the previous reviews about making you feel like an unfit mom. My pup had been sick and I had a theory on what the problem may have been and he wouldn't even entertain the idea, but instead, made me feel bad because my dog got sick. And, my poor dog was terrified of him! He made me feel like I was 2 inches tall and repeatedly looked down his nose at me. Oh, and OVER PRICED! OMG! Who does he think he is??? I did not feel welcomed by him nor his staff. I paid you for a service! No need to treat me so bad!*

62.     Soon after the appearance of these negative reviews, Dr. Perrault and Mr. Vargas began receiving frequent, high-pressure calls from Yelp sales representatives, who promised to manipulate Cats and Dogs' Yelp.com listing page in exchange for Cats and Dogs purchasing an advertising subscription.

63.     For example, on or about January 5, 2010, Cats and Dogs received a Yelp sales call from "Kevin."  Kevin said that Cats and Dogs could advertise with Yelp for a minimum payment of $300 per month, with a minimum 12-month commitment.  Kevin stated that if Cats and Dogs purchased a one-year advertising subscription from Yelp:

a.   Yelp would hide negative reviews on the Cats and Dogs Yelp.com listing page, or place them lower on the listing page so internet users "won't see" them;

b.   Yelp would ensure negative reviews will not appear in Google and other search engine results;

c.   Yelp would allow Cats and Dogs to decide the order that its reviews appear in on its Yelp.com listing page; and

d.   Cats and Dogs could choose its "tagline," i.e., the first few lines of a single review shown on every search result page in which Cats and Dogs appears (for instance, "Veterinarian in Long Beach").

64.   Dr. Perrault declined the offer, saying that he wanted to track referrals from Yelp for three months without ads, but might thereafter be willing to test Yelp's advertising potential.

65.   Within a week of declining Kevin's advertising offer, the negative review from Chris R. – despite violating the Yelp Terms– suddenly reappeared on the Cats and Dogs Yelp.com listing page.

66.   Upon information and belief, Yelp posted the review – despite the fact that it violated its own Terms – as a threat to cause Dr. Perrault to fear that if he did not pay Yelp money to advertise, the negative review would remain.

67.   Soon after, "Kay K." posted a second negative review. This review was added on January 6, 2010, one day after Kevin's sales call:

*I've already left one review about how bad a vet Dr. Perrault is, but I wanted to add something. I've been reading other people's reviews and I must have gone to a different Cats and Dogs Animal Hospital with a vet named Dr. Perrault. Oh wait, no . . . he's the only one. Maybe it's a Dr. Jeckyl / Mr. Hyde thing?! I don't know. But the guy's an @$$. No other way around it. He's a jerk, a D-Bag, And so arrogant. I ran in to him in a neighborhood store right after he saw my poor sick dog at his clinic and he looked right at me, recognized me, rolled his eyes and looked away!!!! Seriously, someone needs to knock this guy down to the size he really is. He needs to drop his Napolean complex and be a professional. After my horrible experience with him, I took my sick dog to Bixby Animal Clinic and I have never had a more pleasant vet experience! Go there instead! My dog loved everyone there! Sorry to rant, but I just wanted to get the word out there. Don't spend the money on this overpriced errogent vet. It's not worth it!*

68.     On or about January 12, 2010, Mr. Vargas contacted Yelp to protest the reappearance of the "Chris R." review and the highly negative, inflammatory "Kay K." reviews.

69.     On January 13, 2010, Mr. Vargas received via email the following response from Yelp:

> We wanted to let you know that we've taken a close look at the reviews by Chris R and Kay K, and after careful evaluation, we have decided to leave both intact.  Because we don't have firsthand knowledge of a reviewer's identity or personal experience, we are not in a position to verify your claims that these reviewers are the same person, or that they are connected to the recent vandalism at your hospital. If a review appears to reflect the personal opinion and experiences of the reviewer while adhering to our review guidelines [link], it is our policy to allow the reviewer to stand behind his or her review.

70.     As of January 18, 2010, a Yelp.com search for "veterinarian in Long Beach" displayed the following tagline for Dogs and Cats:

> *"Dr. Perrault is the most inept/rude veterinarian I have ever met. He had my rescue dog cowering and barking in the corner of the exam room within seconds of meeting him.  He berated me for 20 . . ."*

71.     Upon information and belief, Yelp re-posted the "Chris R" and two "Kay K" reviews and/or manufactured its own reviews to instill fear in Dr. Perrault to advertise so that he could avoid the negative reviews and tagline.

72.     Compare Cats and Dogs' tagline to the tagline (as of January 18, 2010) of Bixby Animal Clinic, a Long Beach veterinary business that is a Yelp Sponsor (and the same company the mysterious Kay K. referred users to in her second Cats and Dogs review):

> *"This place IS awesome. I brought my little man (Bruin) to Dr. A. as a puppy for the puppy package. They have great hours and were able to acommodate me AFTER work so I never had to take extra time . . . "*

73.     As a result of Yelp's conduct, fewer Yelp users viewed the Cats and Dogs Yelp page and fewer customers patronized the business, which caused a decrease in business revenues. Therefore, Cats and Dogs was injured – as a result of Defendant's conduct – by a loss of sales, revenues and/or assets.  In addition, due to the posting of negative reviews, Cats and Dogs' business's reputation was injured.

## **SPONSORS**

**Dr. Tracy Chan, DDS**

74.     Dr. Tracy Chan is a licensed dentist.  Chan's office, Marina Dental Care, is located in San Francisco where she has operated for the past 10 years.

75.     Chan did not voluntarily list her business on Yelp.com.

76.     Prior to spring 2008, Chan's business's overall Yelp star rating was approximately 4.5 or 5 five stars.  There were approximately 30 reviews on Dr. Chan's Yelp review page.

77.     In or around May or June of 2008, Chan started getting telephone calls from a Yelp representative named Quinn Zimmerman ("Zimmerman").  Zimmerman would call Chan frequently, offering her the opportunity to become a business sponsor.  Zimmerman told Chan that if she became a business sponsor (i.e., paid for advertising on Yelp), that Yelp could offer her lots of benefits, such as the opportunity to keep Chan's business ratings high by hiding or burying bad reviews, and by keeping positive reviews at the top of the Marina Dental Care Yelp page and negative reviews at the bottom of the page.  Further, Zimmerman indicated that Chan could put pictures on the Yelp page, and track and increase the number of page views per month.

78.     In addition to the benefits Zimmerman offered Chan, Zimmerman told her that although many Yelp reviews were manipulated by a computer system, Yelp employees also had the ability to remove reviews from a business's Yelp page.  Zimmerman offered Chan advertising for between $300-$500 per month.

79.     In or around August 2, 2008, Chan ultimately declined to purchase Yelp advertising from Zimmerman.

80.     Within 2 to 3 days of the time in which Chan told Zimmerman that she did not want to purchase advertising from Yelp, Yelp removed nine 5-star reviews from Chan's Yelp review page.  As a result, the overall star rating of Marina Dental Care dropped from 5 stars to 3 stars.

81.     After the drop in Marina Dental Care's overall star rating, Chan called Zimmerman to attempt to determine why the drop in the star rating had occurred.  Zimmerman told Chan that

1   Yelp "tweeks" the ratings every so often and that he could help her if she signed up for advertising

2   services with Yelp.

3          82.    Upon information and belief, Yelp removed positive reviews of Chan's business as

4   a threat to cause Chan to fear that if she did not purchase advertising that her business's overall

5   star rating would stay low.  Chan – due to the representations made by Zimmerman and the

6   immediate decline in the reviews of her business – believed that Yelp manipulated Marina Dental

7   Care's reviews to induce her to advertise.

8          83.    As a result, and out of fear of further manipulations, Chan felt compelled to sign up

9   for advertising on Yelp so that Yelp would reinstate the positive reviews.  Chan feared that if she

10   did not pay for advertising, the posting of negative reviews would continue, and her business

11   would suffer.  On August 11, 2008, Dr. Chan signed a one-year contract with Yelp for advertising.

12   Within days of signing the contract, Marina Dental Care's overall star rating increased to 4 stars

13   and various five star reviews were reinstated by Yelp.  Upon information and belief, the positive

14   reviews were reinstated not because of Yelp's automated review filter (or because a user re-

15   posted), but because of Chan's purchase of advertising.

16          84.    In October 2008, Zimmerman asked Chan to start paying an increased payment of

17   $500.00 a month to advertise with Yelp.  Chan said no, and in response, she noticed that her

18   reviews were again declining.

19          85.    In October 2008, Chan – fed up with what she believed to be extortion – decided to

20   cancel her Yelp advertising contract.  Following the termination of her contract, Yelp removed

21   positive reviews on the Marina Dental Care Yelp page and replaced them with negative reviews.

22   Upon information and belief, Yelp's removal of positive reviews was not done pursuant to the

23   Yelp Review Terms, but because Chan decided to terminate her advertising contract.  Upon

24   information and belief, Yelp removed the positive reviews to cause Chan to fear that if she did not

25   pay Yelp for advertising, Yelp would continue to remove positive reviews from her business's

26   Yelp listing.

27

28

86.     In March 2009, after Yelp had – once again – removed several positive reviews, Chan attempted to post a negative review about Yelp's conduct towards her to the Marina Dental Care Yelp review page.  Within two to three days, Yelp removed six positive reviews – all of which were 4 or 5-star ratings – from the Marina Dental Care Yelp page.  As a result, the Marina Dental Care overall Yelp star rating fell to 3 stars.  Upon information and belief, Yelp's removal of the positive reviews was not done pursuant to the Yelp Review Terms, but to induce Chan to pay for advertising and/or to retaliate against her to discourage her from posting negative information about Yelp.

87.     In May 2010, Chan posted a negative review about Yelp to her own website. Within two days, Yelp removed six positive reviews from the Marina Dental Care Yelp page dropping the overall star review of Chan's business from 4 stars to 3.5 stars.

88.     That same month, Chan wrote a letter to Yelp, which described her experiences.  In response, Yelp removed additional positive ratings from the Marina Dental Care Yelp page and the Marina Dental Care overall star rating fell to 2.5 stars.  Upon information and belief, Yelp's removal of the positive reviews was not done pursuant to the Yelp Review Terms, but to induce Chan to pay for advertising and/or to discourage her from posting negative information about Yelp.

89.     Thereafter Chan called Yelp's New York office to inquire about Yelp's automated review system and spoke with "Paul."  Paul stated that the review process was all automated, but when pressed, Paul admitted to Chan that Yelp manually adds and removes reviews based on its own discretion.  He also admitted that Yelp's primary revenue stream is from Sponsors.

90.     As of spring 2010, Yelp had filtered 77 reviews of Chan's office, 75 of which were positive reviews, meaning that the positive reviews were not factored into Chan's office's overall star rating on Yelp.  Upon information and belief, the filtering was not done by the automated filter, but primarily by Yelp as an attempt to threaten Chan so that she would pay for advertising with Yelp.

91.     As a result of Yelp's manipulation of the Marina Dental Care reviews, Chan lost money in advertising costs she paid to Yelp to avoid Yelp's manipulation of the reviews of her business in a manner that did not comply with the Yelp Review Terms.  Chan also experienced a decline in new patients that corresponded almost directly to the decline in Yelp star ratings.

92.     In addition and as a result of Yelp's conduct, fewer Yelp users viewed Chan's business's Yelp page and fewer patients patronized her business, which caused a decrease in Chan's business revenues.  Therefore, Chan was injured – as a result of Defendant's conduct – by a loss of sales, revenues and/or assets.  In addition, due to the posting of negative reviews and/or removal of positive reviews, Chan's business's reputation was injured.

**Paver Pro**

93.     Paver Pro is a landscaping business located in Hayward, California.

94.     Paver Pro did not voluntarily list itself on Yelp.com.

95.     In or around August 2009, five 5-star reviews were removed from Paver Pro's Yelp review page.  At the same time, two negative reviews, including a one-star review, written by "Shirin H" remained on Paver Pro's Yelp review page.  As a result, Paver Pro's overall Yelp star-rating declined.

96.     By early September 2009, Paver Pro received approximately seven or eight more positive reviews on its Yelp review page.

97.     During the first week of September 2009, approximately five of the positive reviews were removed from Paver Pro's Yelp review page.  The two negative one-star reviews remained on Paver Pro's Yelp review page.

98.     Upon information and belief, Yelp removed positive reviews of Paver Pro's business as a threat to cause Paver Pro to fear that if it did not purchase advertising that its business's overall star rating would be low.  Upon information and belief, Yelp maintained the negative reviews, including one written by "Shirin H", which violated the Yelp Content Guidelines or Terms of Service, on Paver Pro's public review page as an implicit threat to further

cause Paver Pro to fear that if it did not purchase advertising, that its business's Yelp overall star rating would remain low.

99.   On September 9, 2009, Paver Pro purchased advertising from Yelp for approximately $300 a month so that the positive reviews it received would be reinstated on the Paver Pro Yelp review page.

100.   After Paver Pro purchased advertising from Yelp, many of the positive reviews that had disappeared were reinstated to the Paver Pro Yelp review page.

101.   As of January 23, 2010, Paver Pro's business had an overall Yelp star rating of 4 stars.

102.   In or around March 23, 2010, Paver Pro decided to stop advertising with Yelp.com.

103.   By April 6, 2010, approximately two weeks later, Paver Pro's overall Yelp star rating had fallen to 3 stars. Upon information and belief, Yelp removed positive reviews of Paver Pro's business from the public review page as a threat to cause Paver Pro to fear that if it did not start advertising again, that its business's overall star rating would remain low.

104.   As a result of Yelp's manipulation of the Paver Pro reviews, Paver Pro lost money in advertising costs it paid to Yelp to avoid Yelp's manipulation of the reviews of its business in a manner that did not comply with the Yelp Review Terms.  Paver Pro also experienced a decline in customers.

105.   In addition and as a result of Yelp's conduct, fewer Yelp users viewed Paver Pro's business's Yelp page and fewer customers patronized the business, which caused a decrease in Paver Pro's business revenues.  Therefore, Paver Pro was injured – as a result of Defendant's conduct – by a loss of sales, revenues and/or assets.  In addition, due to the posting of negative reviews and/or removal of positive reviews, Paver Pro's business's reputation was injured.

**Other Businesses and Persons' Experiences with Yelp**

106.   Upon information and belief, Defendant manipulated the reviews for hundreds or thousands of other businesses before and/or after a Yelp customer service representative spoke to a person or business about advertising on Yelp.  Upon information and belief, Defendant

manipulated the reviews to cause fear in that business or person that if it did not purchase

advertising, Yelp would cause negative reviews to appear or positive reviews to disappear, which

would, in turn, decrease the overall star rating of the business or person and cause it to incur a

decrease in sales, assets, profits, and/or revenues, harm to the business's or person's reputation,

and a loss in advertising costs.[3]  Defendant's conduct impacted businesses and persons located

nationwide and therefore impacted interstate commerce.

## CLASS ACTION ALLEGATIONS

107.   Plaintiffs bring this action on behalf of themselves and all others similarly situated,

pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

108.   The subclasses that Plaintiffs seek to represent are defined as follows:

a) **Non Sponsors**:  All similarly situated businesses and persons nationwide who were in

contact with Yelp regarding the option to advertise on Yelp, declined to purchase

advertising, and as a result of not purchasing advertising, were subject to the

manipulation of the reviews of their businesses by Yelp – in a manner that did not

comply with Yelp's representations regarding its Review Terms[4]  –  during the four

years prior to the commencement of this lawsuit, through the final resolution of this

lawsuit.

---

[3]/ Many stories have been published that describe similar allegations relating to Yelp's conduct.  *See e.g. Yelp and the Business of Extortion 2.0*, available at http://www.eastbayexpress.com/eastbay/yelp-and-the-business-of-extortion-20/Content?oid=1176635; *see also* http:www.yelp.com/biz/yelp-san-francisco.

[4] For purposes of both subclass definitions, Review Terms means, as set forth in the complaint, Yelp's public representation that reviews may only be removed from Yelp if: 1) A user removes the review; 2) Yelp removes the review for violating the Terms of Service or Content Guidelines; or 3)  "The review may have been suppressed by Yelp's automated software system. This system decides how established a particular reviewer is and whether a review will be shown based on the reviewer's involvement on Yelp. While this may seem unfair to you, this system is designed to protect both consumers and businesses alike from fake reviews (i.e., a malicious review from a competitor or a planted review from an employee). The process is entirely automated to avoid human bias, and it affects both positive and negative reviews. It's important to note that these reviews are not deleted (they are always shown on the reviewer's public profile) and may reappear on your business page in the future."

**b)  Sponsors:** All similarly situated businesses and persons nationwide who were in contact with Yelp regarding the option to advertise on Yelp, whose reviews were manipulated by Yelp in a manner that did not comply with Yelp's representations regarding its Review Terms and who thereafter purchased advertising during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit ("**Sponsors**").

109.    This action has been brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

110.    Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

111.    Numerosity:  The Class is so numerous and geographically dispersed that joinder of all Class members is impracticable.  Upon information and belief, there are hundreds, if not thousands, of similarly situated businesses and persons nationwide.

112.    Commonality:  This action presents questions of law and fact common to the members of the Class which predominate over questions affecting individual members of the Class.  Such questions of law or fact include, but are not limited to:

a)        Whether Defendant unlawfully committed extortion, and/or attempted extortion, as a predicate for a violation of California Business & Professions Code § 17200 *et seq.*; and

b)        Whether Defendant unfairly manipulated the reviews of businesses of Plaintiffs and the Class to encourage them to advertise in violation of California Business & Professions Code § 17200 *et seq.*

113.    Typicality:  Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs have no interests that are adverse or antagonistic to the interests of the other members of the Class.

114.     Adequacy of Representation:  Plaintiffs will fairly and adequately protect the interests of the other members of the Class.  Plaintiffs are committed to prosecuting this Class Action and have retained competent counsel experienced in litigation of this nature.

115.     Superiority of Class Action:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all Class Members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.  Class members have been damaged and are entitled to recovery by reason of Defendants' unfair and unlawful business practices.  Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

116.     Class treatment is appropriate and individualized inquiries will not be necessary because, upon information and belief, Yelp's computer software and records will show 1) which class members were contacted for advertising; 2) whether the class members' reviews were manipulated in a manner that did not comply with the Yelp Review Terms; 3) whether the class member did or did not purchase advertising and/or upgrade its advertising package; and 3) whether, in response, the reviews of the class member's business were manipulated in a manner that did not comply with the Yelp Review Terms.

## **FIRST CAUSE OF ACTION**

(Violation of Business & Professions Code § 17200 *et seq.*)

(Sponsors and Non-Sponsors v. Defendant)

117.     Plaintiffs incorporate by reference paragraphs 1 through 116 inclusive, as though fully set forth herein.

118.     Plaintiffs assert this cause of action on behalf of themselves and the Class.

119.     California Business & Professions Code § 17200 *et seq.* prohibits unfair competition that is an unfair or unlawful business practice.

120.     Defendant threatened to or did manipulate the reviews of businesses and/or persons – in a way that did not comply with its own Review Terms – to cause fear in businesses and/or

their owners that if they did not pay Yelp for advertising, Yelp would manipulate the reviews of their business in a way that would cause them financial harm and harm to their business' reputations.

121.    As a result, Defendant unlawfully attempted to and/or did in fact commit extortion, as set forth in California Penal Code sections 518, 519, 523, 524 and/or the Hobbs Act by intentionally and unlawfully using fear (the removal of positive reviews and/or the addition of negative reviews by implicit or explicit threats to cause injury to Class members' businesses) to induce the Class members to consent to pay Defendant for advertising.

122.    As a result, Sponsor Class members were injured in the form of advertising payments they made to Defendants, and are entitled to restitution.

123.    For Non-Sponsor Class members, Defendants took a direct ineffectual step towards committing extortion by attempting to make the Class members fear that if they did not purchase advertising, their overall star rating and/or public reviews would decline.

124.    Non-Sponsor Class members were injured by Defendant's conduct by the harm caused to the reputations of their businesses, a decline in their business assets and profits, and goodwill.  As such, they are entitled to injunctive relief.

125.    The harm to class members caused by Defendant's conduct, which includes threats, retaliation, extortion and/or attempted extortion, is substantially injurious.  Class members have lost sales, profits, revenues, assets, advertising payments, and their business reputations have been harmed due to Defendant's conduct.  Defendant's actions have devastated businesses that are struggling to survive in today's economy.  Defendant's conduct towards Class members – most of whom did not choose to be on Yelp in the first place – is immoral and unethical.  The substantial harm to Class members caused by Defendant's conduct further outweighs any benefits to Defendant or to competition generally and violates public policy.

126.    Sponsor Class members are entitled to equitable and injunctive relief in the form of restitution and disgorgement of all earnings, profits, compensation and benefits Defendants obtained as a result of such unfair and unlawful business practices.  Defendant has been unjustly

1   enriched by receiving substantial monies and profits from advertising payments made by Plaintiffs

2   and the Class to avoid negative manipulations of their reviews.

3          127.    Both Plaintiffs and the Class have been deprived of money, either in the form of

4   lost business revenues and/or assets or in payments made to Defendant for advertising, as a result

5   of Defendant's wrongful conduct and unlawful acts and practices.  Plaintiffs and the Class

6   members, therefore, have sustained injury in fact.

7          128.    Plaintiffs and members of the Class seek a court order requiring Defendant to

8   immediately cease such violations of consumer protection and unfair competition statutes and

9   enjoining Defendant from continuing to conduct business via the unlawful or unfair business acts

10   and practices complained of herein.

11          129.    Plaintiffs additionally request an order requiring Defendant to disgorge its ill-gotten

12   gains as described above and awarding Sponsor Class Members full restitution of all monies

13   wrongfully acquired by Defendant by means of such unlawful business practices and acts of unfair

14   competition, plus interest and attorney fees so as to restore any and all monies to Plaintiffs and the

15   Class that were acquired and obtained by means of such unfair and unlawful business practices.

16          130.    These violations serve as unlawful predicate acts for purposes of Business and

17   Professions Code § 17200, and remedies are provided therein under Business & Professions Code

18   § 17203.

19

20                                **PRAYER FOR RELIEF**

21          **WHEREFORE**, as a result of the foregoing, Plaintiffs pray for relief as follows:

22          1.      Declaring this action to be a proper class action maintainable under Federal Rules

23   of Civil Procedure 23(b)(2) and 23(b)(3), certifying appropriate subclasses and certifying Plaintiffs

24   as Class Representatives;

25          2.      Enjoining Defendant from conducting its business through the unlawful acts and

26   practices described in this Complaint;

27          3.      Requiring Defendant to disgorge its ill-gotten gains, as appropriate;

28

1      4.      Awarding restitution, as appropriate;

2      5.      Awarding pre- and post-judgment interest;

3      7.      Awarding Plaintiffs all costs and expenses, including attorneys' fees, fees permitted

4  under California Code Civil Procedure section 1021 *et seq.*; and

5      8.      Granting such other and further relief as this Court may deem necessary, proper,

6  and/or appropriate.

7

8

9  DATED:  November 17,  2010          **ONGARO BURTT & LOUDERBACK LLP**

10

11

12                          By:  /s/ *David R. Ongaro*
                                  David R. Ongaro
13                               Attorneys for Plaintiff Boris Y. Levitt *et al*.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28