1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8

BORIS Y. LEVITT D/B/A RENAISSANCE            No. C 10-1321 MHP
9    RESTORATION, CATS AND DOGS
     ANIMAL HOSPITAL, INC., TRACY CHAN
10   D/B/A MARINA DENTAL CARE, and          **MEMORANDUM & ORDER**
     PROFESSIONAL CONSTRUCTION
11   GROUP, INC., D/B/A PAVER PRO; on behalf  **Re: Yelp's Motion to Dismiss the Second**
     of themselves and all others similarly situated,  **Amended Class Action Complaint and to**
12                                            **Dismiss or Strike Class Allegations**

            Plaintiffs,
13
        v.
14
     YELP! INC. and DOES 1 through 100
15
            Defendants,
16   _____/

17

18          Plaintiffs Boris Y. Levitt, d/b/a Renaissance Restoration, a/k/a Renaissance Furniture

19   Restoration ("Levitt"), Cats and Dogs Animal Hospital, Inc. ("Cats and Dogs"), Tracy Chan d/b/a

20   Marina Dental Care ("Chan") and Professional Construction Group, Inc. d/b/a Paver Pro ("Paver

21   Pro") on behalf of themselves and all others similarly situated, brought this action under California

22   Business and Professions Code sections 17200, *et seq.*, against defendant Yelp! Inc. ("Yelp") on the

23   basis that Yelp had manipulated online reviews of plaintiffs' businesses in order to coerce plaintiffs

24   into purchasing advertising from Yelp.  Now before the court is Yelp's motion to dismiss plaintiffs'

25   Second Amended Class Action Complaint ("SAC") and to dismiss or strike plaintiffs' class

26   allegations.  Having considered the parties' arguments and submissions, the court enters the

27   following memorandum and order.

28

**United States District Court**
For the Northern District of California

BACKGROUND

I.       General Allegations

Yelp maintains a popular website that allows users to post reviews of businesses.  Users of the website are able to rank businesses on a scale of one to five stars, and based on these reviews Yelp gives the business an overall star rating.  SAC ¶ 2.  On the FAQ section of its website, Yelp states that user reviews may only be removed if (1) a user removes the review, (2) the review violates the Terms of Service or Content Guidelines, or (3) it was suppressed by Yelp's automated filtering software.  SAC ¶ 6; *see also* Docket No. 60 (Beringer Decl.) Exh. 2 (Yelp FAQ) at 3.  Yelp states the following regarding its review filter:

> This system decides how established a particular reviewer is and whether a review will be shown based on the reviewer's involvement on Yelp.  While this may seem unfair to you , this system is designed to protect both consumers and businesses alike from fake reviews (i.e. malicious review from a competitor or a planted review from an employee).  The process is entirely automated to avoid human bias, and it affects both positive and negative reviews.  It's important to note that these reviews are not deleted (they are always shown on the reviewer's public profile) and may reappear on your business page in the future.

SAC ¶ 6.  According to the Yelp FAQ, the filtered reviews are not included in a business's overall star rating.  SAC at 3 n.2; Yelp FAQ at 3.  Businesses are not able to opt out of being listed on the Yelp website, but Yelp offers businesses free "Business Owner Accounts," which allow the owner to track page views, update business information, and, to a limited extent, contact reviewers.  SAC ¶¶ 25, 26.

Yelp also provides opportunities for businesses to advertise on its website.  Yelp states that paid advertising allows a business to (1) place a listing above Yelp search results and on related business pages, (2) enhance a page listing with a photo slideshow, and (3) promote a favorite review at the top of their Yelp page, but not otherwise change or re-order reviews.  Advertising subscriptions range from $300 to $1,200 per month.

Plaintiffs allege that Yelp does not comply with its user review and removal policy and instead actively manipulates user reviews to force businesses into purchasing advertising.  SAC ¶ 7. Yelp salespersons represent to businesses—either implicitly or explicitly—that they can manipulate

United States District Court

For the Northern District of California

business listing pages in favor of businesses who decide to purchase advertising (referred to in the SAC as "Sponsors"). *Id.* ¶ 37.   Businesses who decline advertising ("Non-Sponsors"), on the other hand, routinely observe that  positive reviews disappear soon after declining an ad subscription and that there is an increase in the number of negative reviews, including reviews that are false.  *Id.* ¶ 31-33.  Plaintiffs allege that Yelp manipulates its listings in favor of Sponsors and detrimentally to Non-Sponsors by (1) relocating or removing negative reviews of Sponsors; (2) posting positive reviews of Sponsors and urging others to do the same; (3) allowing Sponsors to choose the order in which reviews appear; (4) removing positive reviews of Non-Sponsors, (5) posting negative reviews of Non-Sponsors and urging others to do the same and (6) enforcing its Terms of Service for Sponsors, but refusing to do so for Non-Sponsors.  *Id*. ¶ 39.  Plaintiffs allege that this conduct instills fear in business owners that their businesses will suffer if they decline to purchase advertising.  *Id*. ¶ 38.

II.        Non-Sponsor Plaintiffs

        A.        Levitt

        In early 2008, Levitt signed up for a free business account on Yelp.com, and after doing so his business received several positive reviews and one negative review.  In early May 2009, several of the positive reviews disappeared, causing a drop in the overall star rating of Levitt's business.  *Id*. ¶ 43.  On or about May 13, 2009, Levitt contacted Yelp to inquire about the removal of a positive review, and a Yelp representative said she could not assist in removing the review and would forward the request to the Yelp engineering team.  *Id*. ¶ 44.[1]  In July 2009, Levitt was contacted twice by telephone by a Yelp ad sales representative.  During the second of these calls, the sales rep told Levitt that purchasing advertising would help increase the number of Yelp page views.  Levitt told the sales rep that he didn't need to advertise because his business already had an overall rating of 4.5 stars.  At that time, Levitt had seven 5-star reviews, one 4-star review and one 1-star review.  *Id*. ¶¶ 45-47.  Two days later, six out of the seven 5-star reviews were removed from his business's Yelp page, leaving an overall star rating of 3.5 stars.  During the month of August 2009, Levitt's Yelp page received only 158 page views compared with 261 page views in July 2009.  Levitt claims to have experienced a corresponding decline in business revenues.  He also claims that the decline in

United States District Court

For the Northern District of California

overall star rating hurt his business's reputation.  *Id.* ¶¶ 48-50.  Since Levitt declined to purchase advertising, he alleges that every 5-star review of his business has been removed within 2-3 days of posting and that as of the filing of the original Complaint, ten out of eleven 5-star reviews had been removed.  *Id.* ¶ 53.

**B.**   **Cats and Dogs**

On or about September 15, 2009, the Hospital Manager at Cats and Dogs contacted Yelp about a negative review from "Chris R." that allegedly violated Yelp's review guidelines.  Yelp subsequently removed the review.  *Id.* ¶¶ 57-60.  A second negative review of Cats and Dogs, from "Kay K.," appeared within five days of the "Chris R." removal.  Soon thereafter, Cats and Dogs received "frequent, high-pressure calls from Yelp sales representatives, who promised to manipulate Cats and Dogs' Yelp.com listing page" if Cats and Dogs purchased advertising.  *Id.* ¶ 61.  One sales rep, "Kevin" allegedly told Cats and Dogs that Yelp would (1) hide negative reviews of Cats and Dogs or place them lower on the listing page, (2) ensure that negative reviews did not appear in Google or other search engine results, (3) allow Cats and Dogs to decide the order that its reviews appear and (4) allow Cats and Dogs to choose its "tagline," i.e., the first few lines of a single review shown on every Yelp search result page on which Cats and Dogs appears.  *Id.* ¶ 63.  Cats and Dogs declined the offer, and within one week the negative review from "Chris R." reappeared.  *Id.* ¶ 65.  Soon after, another negative review from "Kay K." appeared.  *Id.* ¶ 67.  A Cats and Dogs employee contacted Yelp to protest the two negative ads, but Yelp decided to leave the ads intact, explaining that "we are not in a position to verify your claims that these reviewers are the same person, or that they are connected to the recent vandalism at your hospital."  *Id.* ¶¶ 68-69.  Yelp's conduct allegedly caused Cats and Dogs a loss in customers, page views, sales and business revenues.  *Id.* ¶ 73.

**III.**   **Sponsor Plaintiffs**

**A.**   **Chan**

Prior to spring 2008, Chan's dental business had an overall star rating of 4.5 or 5 stars and had approximately 30 reviews.  In or around May or June 2008, Chan started receiving frequent phone calls from a Yelp sales rep, who told Chan that if she purchased advertising, Yelp could offer

4

her benefits including hiding or burying negative reviews and keeping positive reviews at the top of the listings page.  The sales rep also told Chan that although many Yelp reviews were manipulated by a computer system, Yelp employees also had the ability to remove reviews.  *Id.* ¶¶ 76-78.  In or around August 2, 2008, Chan expressly declined to purchase advertising, and within 2-3 days, Yelp removed nine 5-star reviews from Chan's business listing page.  As a result, the overall star rating for the business dropped from 5 stars to 3 stars.  *Id.* ¶¶ 79-80.

Chan inquired with the Yelp sales rep about the decline in star rating, and the sales rep told her that Yelp "tweaks" ratings every so often and that he could help her if she purchased advertising. *Id.* ¶ 81.  Allegedly fearing that the negative reviews would continue if she did not purchase advertising, on August 11, 2008 Chan signed a one-year contract for advertising.  Within days of signing, her business's star rating increased to 4 stars and various five star reviews were reinstated. *Id.* ¶ 83.  In October 2008, the Yelp sales rep asked Chan to pay an increased payment of $500 per month, and upon declining the offer Chan noticed that her reviews were again declining.  *Id.* ¶ 84. Chan cancelled her advertising contract that month, and upon termination of her contract Yelp allegedly removed positive reviews and replaced them with negative reviews.  *Id.* ¶ 85.

In March 2009, after Yelp had removed several additional positive reviews, Chan posted a negative review about Yelp's conduct on her business's review page, and within two or three days, six positive ratings were removed, lowering the overall star rating to 3 stars.  In May 2010, Chan posted a negative review about Yelp to her own website, and within two days, Yelp removed six positive reviews from her business's Yelp review page, lowering the overall star rating from 4 stars to 3.5 stars.  That same month, Chan wrote a letter to Yelp describing her experiences, and "in response" Yelp removed additional positive ratings, lowering the overall star rating to 2.5 stars. Chan thereafter called Yelp's New York office to inquire into Yelp's automated review system and spoke with "Paul," who stated that the review process was entirely automated but admitted when pressed that Yelp manually adds and removes reviews in its own discretion. *Id.* ¶¶ 86-90.

5

United States District Court

For the Northern District of California

As of spring 2010, Yelp had allegedly filtered 77 reviews of Chan's business, 75 of which were positive reviews.  Chan allegedly lost money in advertising costs, experienced a decline in new patients and business revenues, and suffered injury to her business reputation.  *Id.* ¶¶ 90-92.

B.      Paver Pro

In or around August 2009, five 5-star reviews were removed from Paver Pro's Yelp page.  At the same time, two negative reviews, including a 1-star review by "Shirin H." remained, causing a decline in the overall star rating.  *Id.* ¶ 95.  By early September 2009, Paver Pro received approximately seven or eight more positive reviews, but approximately five of those positive reviews were removed.  *Id.* ¶ 96.  On September 9, 2009, Paver Pro purchased advertising from Yelp for approximately $300 per month, and afterwards many of the previously removed positive reviews that had disappeared were reinstated.  *Id.* ¶¶ 99-100.  As of January 23, 2010, Paver Pro had an overall star rating of 4 stars.  *Id.* ¶ 101.  In or around March 23, 2010, Paver Pro decided to stop advertising with Yelp, and by April 6, 2010, Paver Pro's overall star rating had fallen to 3 stars.  *Id.* ¶¶ 102-103.  As a result of these events, Paver Pro lost money in advertising costs, allegedly experienced a decline in customers and revenues, and suffered injury to its business reputation.  *Id.* ¶¶ 104-105.

IV.     Class Allegations

Plaintiffs seeks to represent two subclasses of individuals who have allegedly been harmed by Yelp's manipulation of user reviews and the overall star ratings:  Non-Sponsors (those whose reviews were manipulated but did not buy advertising) and Sponsors (those whose reviews were manipulated and who thereafter purchased advertising).  Non Sponsors are defined as:

> All similarly situated businesses and persons nationwide who were in contact with Yelp regarding the option to advertise on Yelp, declined to purchase advertising, and as a result of not purchasing advertising, were subject to the manipulation of the reviews of their businesses by Yelp—in a manner that did not comply with Yelp's representations regarding its Review Terms—during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit.

*Id.* ¶ 108(a).  Sponsors are defined as:

> All similarly situated businesses and persons nationwide who were in contact with Yelp regarding the option to advertise on Yelp, whose reviews were manipulated by Yelp in a

manner that did not comply with Yelp's representations regarding its Review Terms and who thereafter purchased advertising during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit.

*Id*. ¶ 108(b).

V.      Procedural Background

On February 23, 2010, Cats and Dogs filed an action in the United States District Court for the Central District of California for unfair business practices in violation of California Business & Professions Code § 17200.  *See* Case No. C 10-2351, Docket No.1.  On March 12, 2010, Levitt filed an action in San Francisco Superior Court against Yelp for violations of California Business & Professions Code §§  17200 *et seq.* and 17500 *et seq*. as well as for negligent and intentional misrepresentation. *See* Case No. C 10-1321, Docket No. 1.  On March 29, 2010, Yelp removed the *Levitt* action to this court.  *Id*.  On May 28, 2010 the *Cats and Dogs* action was transferred to this court, and on July 20, 2010 the two cases were consolidated into the 10-321 action.  *See* Case No. C 10-2351, Docket No. 57; Case No. C 10- 1321, Docket No. 31.  On September 23, 2010, plaintiffs filed a First Amended and Consolidated Class Action Complaint, alleging violations of sections 17200 & 17500 and intentional interference with prospective business advantage.  *See* Docket No. 48.  On November 22, 2010, plaintiffs filed the SAC, alleging solely a section 17200 violation.  *See* Docket No. 58.  On December 17, 2010, Yelp filed the instant motion to dismiss the SAC for lack of Article III standing under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Rule 12(b)(6) as well as a motion to strike and/or dismiss the class allegations under Rules 12(b)(6), 12(f) and/or 23.  *See* Docket No. 59 (Mot.)

LEGAL STANDARD

I.      Rule 12(b)(1) Standing

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (1) tests the subject matter jurisdiction of the court.  *See, e.g., Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039-40 (9th Cir. 2003).  Under Article III of the Constitution, federal judicial power extends only to "Cases" and "Controversies."  U.S. Const., art. III, § 2, cl. 1.  Article III standing is thus a threshold

requirement for federal court jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). At a constitutional minimum, standing requires the party invoking federal jurisdiction to show that it has "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (citations and internal quotation marks omitted).  To satisfy the injury in fact requirement, the alleged harm must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted). The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.* at 561.

II.     Rule 12(b)(6) Motion to Dismiss

        Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief can be granted against that defendant.  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal may be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1988).  A motion to dismiss should be granted if a plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).

        Allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir.1996). The court need not, however, accept as true pleadings that are no more than legal conclusions or the "formulaic recitation of the elements" of a cause of action. *Iqbal*, 129 S.Ct. at 1950; *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).  "Determining whether a complaint states a plausible claim for

8

relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

DISCUSSION

I.    Article III Standing

Yelp argues that plaintiffs have failed to allege sufficient facts to establish that they have the

"irreducible constitutional minimum of standing" under Article III of the Constitution.  Mot. at 12

(quoting *Lujan*, 504 U.S. at 560).  To establish Article III standing, a plaintiff must show that "(1) it

has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision.*" Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167,

180-81, (2000).  Yelp argues that plaintiffs have failed to make plausible, non-speculative

allegations that they have suffered an injury in fact and that such an injury was a result of Yelp's

allegedly wrongful conduct.  The court disagrees and is satisfied, based on the allegations in the

SAC, that it may exercise its limited jurisdiction in this case.

Plaintiffs allege that as a result of Yelp's manipulation of their business's reviews and overall

star ratings they have suffered the following injuries: harm to reputation, loss of Yelp page views,

loss in customers, a decline in business revenues and (for Sponsor plaintiffs) the payment of monthly

advertising fees.  These alleged injuries are sufficient to establish an "injury-in-fact" for purposes of

Article III.  *See Meese v. Keene*, 481 U.S. 465, 472-477 (1987) (finding harm to "personal, political,

and professional reputation" to be a cognizable injury);  *Presbyterian Church (U.S.A.) v. United

States*, 870 F.2d 518, 522-23 (9th Cir. 1989) (finding that allegations of decrease in church

participation were sufficient to establish standing);  *Humphries v. Los Angeles County*, No. SACV

03-697 JVS, 2005 WL 6431760, at *5-7 (C.D. Cal. Aug. 22, 2005), *rev'd on other grounds*, 131 S.

Ct. 447 (2010) (finding reputational harm from inclusion in a Child Abuse Central Index to be

sufficient to confer Article III standing).  Although plaintiffs' allegations of injury may not be

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    particularly detailed, they are also not "conjectural or hypothetical" and are plausibly explained in

2    the context of their allegations of wrongful conduct by Yelp.  Plaintiffs allege that Yelp is viewed by

3    millions of unique Internet users each month and that as a result of Yelp's efforts to manipulate user

4    reviews to the detriment of Non-Sponsors, they witnessed a decline in the number of Yelp page

5    views, a proportional increase in the number of negative reviews, and a lower overall star rating.

6    Moreover, plaintiffs point to specific negative, inflammatory reviews, *see, e.g.*, SAC ¶¶ 61, 67, and

7    it would strain credulity to conclude that such reviews would not harm reputation, discourage

8    patronage, and cut into revenues.

9           For similar reasons, plaintiffs have adequately alleged that these injuries are "fairly

10   traceable" to Yelp's alleged wrongful conduct.  The SAC is replete with allegations that plaintiffs

11   saw a decline in positive reviews, an increase in negative reviews and/or a decline in overall star

12   rating soon after declining to purchase advertising from Yelp or complaining about Yelp's handling

13   of their complaints.  If Yelp in fact manipulated user reviews as alleged, plaintiffs have at the very

14   least alleged circumstances from which a causal nexus to their injuries can be inferred.  This is not to

15   say, however, that plaintiffs have sufficiently alleged wrongful conduct by Yelp,  *see infra* § III, but

16   assuming *arguendo* that they have, the SAC sufficiently alleges causation for standing purposes.  *In*

17   *re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Prods. Liability*

18   *Litig.*, —F. Supp. 2d—, 2010 WL 4867562, at *6 (C.D. Cal. 2010) ("Standing merely requires a

19   redressable injury that is fairly traceable to Defendants' conduct.  Whether a plaintiff can recover for

20   that injury under a particular theory of liability is a separate question.").

21          Lastly, the injunctive and restitutive relief requested would sufficiently redress plaintiffs'

22   injuries.  Sponsor plaintiffs have lost money from advertising they allegedly would not have

23   expended but for perceived coercion from Yelp, and a favorable ruling could restore those lost

24   expenditures.  Moreover, to the extent that plaintiffs' Yelp reviews continue to be artificially

25   deflated as a result of not purchasing advertising, an injunction prohibiting Yelp from manipulating

26   user reviews in contravention of their stated review policies would remedy, at least in part, the

27   injuries suffered by plaintiffs and their businesses.

28

United States District Court

For the Northern District of California

1    Yelp also argues that plaintiffs lack standing because any injuries they suffered are directly

2  traceable to negative reviews posted by independent third-parties or to Yelp's editorial decision not

3  to publish certain favorable reviews.  Accordingly to Yelp, it is "squarely immune" under the

4  Communications Decency Act ("CDA"), 47 U.S.C. § 230(c), from claims arising from such activity.

5  Mot. at 15.  Although, as explained more fully below, Section 230(c) precludes certain aspects of

6  plaintiffs' unfair and unlawful practices claims, it does not provide Yelp blanket "immunity" from

7  suit or in any way limit this court's jurisdiction over plaintiffs' claims.  *See Barnes v. Yahoo!, Inc.*,

8  570 F.3d 1096, 1100 (9th Cir. 2009) ("[I]t appears clear that neither this subsection nor any other

9  declares a general immunity from liability from third-party content . . . 'Subsection (c)(1) does not

10 mention 'immunity' or any synonym.'" (quoting *Chi. Lawyers' Comm. for Civil Rights Under Law,

11 Inc. v. Craigslist, Inc*, 519 F.3d 666, 669 (7th Cir. 2008)); *Energy Automation Sys., Inc. v. Xcentric

12 Ventures LLC*, No. 3:06-1079, 2007 WL 1557202, at (M.D. Tenn. May 25, 2007) ("Although courts

13 speak in terms of 'immunity' . . . this does not mean that the CDA has created an 'immunity from

14 suit' . . .  Whether or not that defense applies in any particular case is a question that goes to the

15 merits of that case, and not to the question of jurisdiction.").  Section 230(c) prohibits causes of

16 action in which a plaintiff seeks (1) to treat that entity as the publisher of independently posted

17 content, 47 U.S.C. § 230(c)(1); *see, e.g., Barnes*, 570 F.3d at 1103 or (2) to challenge the good faith

18 blocking or removal of certain categories of objectionable content, 47 U.S.C. § 230(c)(2); *see, e.g.*,

19 *e360insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605 (N.D. Ill. 2008).  Yelp provides no

20 authority for the broader proposition that Section 230(c) affects this court's subject matter

21 jurisdiction.

22 II.    Standing under the UCL

23    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code sections 17200 *et

24 seq.*, and False Advertising Law ("FAL"), Cal. Bus & Prof.Code sections 17500 *et seq.*, were

25 amended via a ballot initiative passed in November 2004 such that standing to bring a private claim

26 under either statute is limited to "any person who has suffered injury in fact and has lost money or

27 property as a result of" such unfair competition or false advertising.  Cal. Bus. & Prof.Code §§

28

11

17204 & 17535.  "To satisfy the narrow standing requirements imposed by Proposition 64, a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 2011 WL 240278, at *5 (Cal. Jan. 27, 2011) (emphasis in original).

    In determining whether a plaintiff has suffered an "injury in fact" for purposes of the UCL, California has incorporated the federal meaning of the term.  *Id*.  UCL standing is, however, "substantially narrower" than federal standing in that the only type of cognizable injury is "economic injury."  *Id*. at *6.  "There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."  *Id*.  The California Supreme Court has emphasized that "injury-in-fact is not an substantial or insurmountable hurdle" and that for purposes of standing an allegation of "a specific measure of the amount of [] loss is not required.  It suffices that a plaintiff can allege an 'identifiable trifle.'"  *Id*. at *7, 10 n.15 (citations omitted).

    For the reasons set forth above, plaintiffs have sufficiently alleged an "injury-in-fact" under federal law, and under *Kwikset*, this injury in fact satisfies the state law definition of the term.  Moreover, plaintiffs have sufficiently alleged that they have suffered an economic injury.  Sponsor plaintiffs allegedly purchased advertising because they perceived that Yelp was manipulating user reviews to their detriment, and thereby they "surrender[ed] in a transaction more . . . than [they] otherwise would have."  *Id*. at *6.  Yelp does not appear to seriously contest that this outlay of advertising funds constitutes economic injury, but instead points out insufficient allegations of a threat by Yelp.  *See* Docket No. 63 (Reply) at 7.  This alleged deficiency, again, goes to the merits of plaintiffs' allegations of wrongful conduct, not to whether a sufficient injury has been pled for purposes of standing.

12

Plaintiffs also have sufficiently alleged an economic injury with respect to the Non-Sponsor plaintiffs. Although Levitt and Cats and Dogs never actually purchased advertising from Yelp, they do allege that Yelp's conduct led to a loss in patronage and revenues, thereby impacting the economic value of plaintiffs' businesses. See *Finelite, Inc. v. Ledalite Arch. Prods*, No. C 10-1276 MMC, 2010 WL 3385027 (N.D. Cal. Aug. 26, 2010) (Chesney, J.) (finding UCL standing based on allegations that the defendant's false advertising "cause[d] a diversion of sales" which resulted in the plaintiff having "lost sales"). The SAC does not specifically quantify the harm to plaintiffs' businesses, but *Kwikset* explicitly states that this is unnecessary; all that needs to be alleged is "an identifiable trifle." *Id*. at 7, 10 n.15. The plausible loss of revenues and customers due to the proliferation of negative consumer reviews and the relative paucity of positive reviews is sufficient to allege at least a trifle of economic injury to Non-Sponsor plaintiffs.

III.    Section 17200 Claim

Plaintiffs allege that Yelp has violated Cal. Bus. & Profs. Code § 17200 *et seq.* by manipulating user reviews so as to favor its advertisers and coerce other businesses into purchasing advertising. Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." Cal. Bus. & Prof. Code § 17200. Because section 17200 is written in the disjunctive, "a business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition under the UCL." *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1093 (2007). In the SAC, plaintiffs allege that Yelp's conduct violated both the unlawful and unfair prongs of the UCL.

A.    Unlawful Prong

Under its "unlawful" prong, the UCL borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." *See Berryman v. Merit Prop. Mgmt.*, 152 Cal. App. 4th 1544, 1554 (2007) (internal quotation marks and citation omitted; alteration in original). "Virtually any law—federal, state or local—can serve as a predicate for an action under [Section 17200]." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1360 (2010); *see Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717-18 (2001) (holding the unlawful prong forbids

13

United States District Court

For the Northern District of California

"anything that can be properly called a business practice and that at the same time is forbidden by law"). As predicate for the unlawful prong of the UCL, plaintiffs allege that Yelp "unlawfully attempted to and/or did in fact commit extortion as set forth in California Penal Code sections 518, 519, 523, 523 and/or the Hobbs Act." SAC ¶ 21. Under California law, "[e]xtortion is the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear." Cal. Penal Code § 518. Fear for purposes of extortion may be accomplished by a threat "[t]o do an unlawful injury to the person or property of the individual threatened or of a third person." *Id.* § 519. Extortion under the Hobbs Act is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Definitions of extortion under federal and California law are interpreted "substantially the same." *Petrochem Insulation, Inc. v. N. Cal. & N. Nev. Pipe Trades Counsel*, No. C 90-3628 EFL, 1991 WL 158701, at *3 (N.D. Cal. Apr. 30, 1991) (Lynch, J.).

Plaintiffs do not appear to argue that Yelp ever explicitly threatened to harm their businesses, through manipulating user reviews, if they refused to purchase advertising. Instead they allege four sets of actions by Yelp from which an extortionate threat "may be implied":

1) Yelp removed positive reviews, thereby changing the overall star rating, immediately after plaintiffs declined to purchase advertising or terminated their advertising contracts

2) Yelp maintained negative reviews even though the reviews violated Yelp's Review Terms

3) Yelp manufactured its own negative reviews of plaintiffs' businesses

4) Yelp stated that paying for advertising would help Plaintiff's overall star rating because Yelp "tweaks" the ratings, "manually adds and removes reviews in its own discretion" and its employees have the ability to remove reviews

Opp. at 17. These theories of extortion, at least as framed by the allegations in the SAC, are insufficient to survive a motion to dismiss.

As a preliminary matter, to the extent that the extortion claim is premised on Yelp's failure to remove negative reviews (point #2 above), this activity is clearly immunized by the CDA. The CDA provides that "[n]o providers or user of an interactive computer service shall be treated as the

14

United States District Court

For the Northern District of California

publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It is generally undisputed that website operators constitute providers of an "interactive computer service." *See Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008) (en banc). An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Section 230(c)(1) of the CDA establishes immunity for providers of an online platform (with exceptions inapplicable here) where liability hinges on content independently created or developed by third-party users. So long as the service provider has no part in the creation of the third-party content, it is irrelevant for purposes of Section 230(c)(1) how incendiary or blatantly harassing that content may be, whether the provider has knowledge of the complained-of content, or whether it has a "general monitoring policy" for such content. *See, e.g.*, *Barnes*, 570 F.3d at 1103, 1108 (notwithstanding the plaintiff's take-down request, holding that CDA precluded action for failing to remove nude photographs of the plaintiff posted by her ex-boyfriend ). "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates.com*, 521 F.3d at 1170-71. Accordingly, Yelp cannot be held liable on a theory that it extorted plaintiffs by refusing to de-publish negative business reviews.

The CDA does not, however, preclude liability stemming from Yelp's own alleged postings, from statements made by its ad salespersons, or from Yelp's deliberate manipulation of customer reviews.[2] "A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is "responsible, in whole or in part" for creating or developing, the website is also a content provider." *Roommates.com*, 521 F.3d at 1162. Plaintiffs' third category of purported implied threats—that Yelp manufactured negative reviews—therefore is potentially actionable, because Yelp, and not some third-party, is the alleged provider of such content. *See id*. at 1165 ("Roommate's own acts—posting the questionnaire and

15

United States District Court

For the Northern District of California

1    requiring answers to it—are entirely its doing and thus section 230 of the CDA does not apply to

2    them."). Similarly, plaintiffs' fourth category of purported threats—its representations that it could

3    manipulate reviews in favor of advertisers—are also actionable. *See Mazur v. eBay, Inc.*, No. C 07-

4    3967 MHP, 2008 WL 618988, at *10 (N.D. Cal. Mar. 4, 2008) (Patel, J.) (denying motion to dismiss

5    claim premised on eBay's "affirmative representations" about its auctions).

6          A closer question is whether Yelp may be held liable for its removal of positive reviews for

7    the alleged purpose of coercing businesses to purchase advertising. On one hand, plaintiffs' theory

8    is premised upon Yelp's alleged decision not to publish third-party reviews, and certain statements

9    by the Ninth Circuit could be interpreted so as to immunize the removal of positive reviews,

10   regardless of the website operator's intent. *See Barnes*, 570 F.3d at 1105 ("Subsection (c)(1), by

11   itself, shields from liability all publication decisions, *whether to edit, to remove, or to post*, with

12   respect to content generated entirely by third parties." (emphasis added)); *Roommates.com*, 521 F.3d

13   at 1170 n.29 ("[T]here can be no meaningful difference between an editor starting with a default rule

14   of publishing all submission and then manually selecting material to be removed from publications,

15   and a default rule of publishing no submissions and manually selecting material to be published.").

16   On the other hand, the decision to remove certain content is immunized under this logic because it

17   "is something publishers do," *Barnes*, 570 F.3d at 1103, and Section 230(c)(1) immunity protects

18   service providers from lawsuit for "its exercise of a publisher's traditional editorial functions."

19   *Mazur*, 2008 WL 618988, at *9 (quoting *Gentry v. eBay*, 99 Cal. App. 4th 816, 828-29 (2002)).

20   Choosing not to publish content for the purposes of harming a particular business or to coerce that

21   business into purchasing advertising seems quite distinct from the traditional editorial functions of a

22   publisher. Moreover, Section 230(c)(*2*) of the CDA explicitly shields service providers from civil

23   liability on the basis of removing certain forms of offensive materials, but it conditions this

24   protection on such actions being taken in "good faith." 47 U.S.C. 230(c)(2)(A).[3] Under the theory

25   of extortion proffered by plaintiffs, Yelp's removal of positive user reviews certainly was not in

26   good faith, and other courts have denied motions to dismiss on the basis of CDA immunity in these

27   circumstances. *See Smith v. Trusted Stds. in Electronic Transactions, Inc*., No. 09-4567

28

16

(RBK/KMW), 2010 WL 1799456, at *7 (D.N.J. May 4, 2010) ("[T]he Court cannot grant immunity on the present record because it is not clear that Comcast acted in good faith."); *Nat'l Numismatic Cert., LLC v. eBay, Inc.*, No. 6:08–cv-42-Orl-19GJK, 2008 WL 2704404, at *24 (M.D. Fla. July 8, 2008) ("With allegations in the Amended Complaint that eBay acted in bad faith, the Court should not grant dismissal under Federal Rule of Civil Procedure 12(b)(6).").

Regardless, the SAC fails to plausibly allege that any of Yelp's conduct amounted to an implied extortionate threat. Firstly, it is entirely speculative that Yelp manufactures its own negative reviews or deliberately manipulates reviews to the detriment of businesses who refuse to purchase advertising. The SAC provides no basis from which to infer that Yelp authored or manipulated the content of the negative reviews complained of by plaintiffs.

Secondly, the SAC lacks factual allegations from which any distinct communication of a threat might be inferred. Although "[n]o precise or particular form of words is necessary in order to constitute a threat" and "[t]hreats can be made by innuendo and the circumstances under which the threat is uttered" can be taken into consideration, *People v. Oppenheimer*, 209 Cal. App. 2d 413, 422 (1963), the threats alleged here are far too attenuated from any intentional extortionate activity by Yelp. At first blush, the close temporal proximity between plaintiffs' decisions not to purchase advertising and the removal of positive user reviews might appear to send a message that there are negative consequences in refusing to buy advertising from Yelp. The removal of positive reviews, however, is entirely consistent with Yelp's policy, stated in its FAQs and referenced in the SAC, that it automatically filters potentially fake positive and negative reviews. The SAC purports to document fluctuations in plaintiffs' overall star ratings that apparently correlate with their advertising decisions, but it in actuality only provides select snapshots of plaintiffs' overall star ratings. For example, the SAC alleges that in March 2009, Chan's overall star rating fell to 3 stars (but doesn't indicate from what), that in May 2010 her overall star rating dropped from 4 stars to 3.5 stars, and that later that month her overall star rating fell to 2.5 stars. Chan's mixture of positive and negative reviews fluctuated over time irrespective of the activities complained of in the SAC, and in the absence of a more complete picture of Chan's reviews, the court cannot equate a few drops in

overall star ratings to an implied threat of harm from Yelp.  These fluctuations could just as easily be the result of planted ads by plaintiffs, the functioning of Yelp's automated filter, or negative attacks from competitors or former employees.  Indeed, the SAC alludes to a "vandalism" of Cats and Dogs' hospital in the context of one of the complained-of reviews.  *See* SAC ¶ 69.  Moreover, the SAC reveals that at least for Levitt and Paver Pro, positive reviews disappeared long before any communications with Yelp about advertising.  *See* SAC ¶¶ 43 (indicating that several positive reviews disappeared two months earlier); 95 & 97 (indicating that ten 5-star reviews disappeared prior to Paver Pro discussions of advertising with Yelp).  Inferring an implied extortionate threat from the removal of these positive reviews is particularly inappropriate given that Levitt and Paver Pro contacted Yelp in the first instance, and not vice versa.

The alleged statements by Yelp sales reps that they could manipulate ads in favor of advertisers are also insufficient to imply a threat of harm to plaintiffs.  As a preliminary matter, the statements allegedly made to Levitt nowhere near indicate an ability or a regular practice of "manipulating" user reviews.  The sales rep merely told him that advertising could increase the number of page views he received—a reasonable, and fairly obvious, consequence of advertising.  SAC ¶ 46.  Paver Pro never alleges any conversations at all with Yelp salespersons.  Although the SAC alleges more concrete and detailed representations made to Cats and Dogs and Chan, these offers of favorable treatment in exchange for ad purchases are not the equivalent of an extortionate threat of harm.  *See United States v. Tomblin*, 46 F.3d 1369, 1384 (5th Cir. 1995) (observing that although fear of economic harm is cognizable under the Hobbs Act, "the fear . . . must be of a loss; fear of losing a potential benefit does not suffice."); *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (concluding that request for payment in exchange for improved chance of getting hired did not constitute an extortionate threat); *Sigmund v. Brown*, 645 F. Supp. 243, 246 (C.D. Cal. 1986) (holding that offer to provide chiropractor with favorable reviews in exchange for client referrals was not an extortionate threat).  Although the alleged sales pitches may be troubling in light of the review policies disclosed on Yelp's website, the SAC fails to allege, beyond a speculative level that these statements rise to the level of extortion.

1    Plaintiffs' claim under the Section 17200's unlawful prong must therefore be dismissed.

2         B.    Unfair Prong

3         "[T]here is some uncertainty about the appropriate definition of the word 'unfair' in the

4    UCL." *Camacho v. Automobile Club of Southern California*, 142 Cal. App. 4th 1394, 1400 (2006).

5    Although the California Supreme Court provided a relatively clear definition of the term to apply in

6    cases where a business competitor alleges anti-competitive practices, *see Cel-Tech Communications,*

7    *Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 187 (1999), it has not determined the

8    proper test in other contexts. *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (2007).

9    Some courts apply the *Cel-Tech* test in non-competitor contexts, which requires that "unfairness

10   must 'be tethered to some legislatively declared policy or proof of some actual or threatened impact

11   on competition.'" *Id.* at 735 (quoting *Cel-Tech*, 20 Cal.4th at 186). Others adhere to an older

12   balancing test established in *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72

13   Cal.App.4th 861, 886(1999), which weighs the unfair practice's "impact on its alleged victim . . .

14   against the reasons, justifications and motives of the alleged wrongdoer." Still others have created

15   entirely different tests or blended the *Cel-Tech* and *South Bay* approaches. *See Lozano*, 504 F.3d at

16   736. In *Lozano*, the Ninth Circuit held that, "in the absence of further clarification by the California

17   Supreme Court," district courts may apply either or both the *Cel-Tech* or *South Bay* tests to

18   determine if a defendant's conduct is "unfair." *Id.*

19        Plaintiffs allege that Yelp has committed an unfair business practice by "showing that Yelp

20   represents itself, deceivingly, to businesses and the public generally as being a non-biased third-

21   party review system, but that in actuality its review system is directly linked to whether a business

22   pays Yelp to advertise." Opp. at 21. It also reiterates the allegations under the unlawful prong that

23   "Yelp forces small businesses to pay for advertising because if they choose not to, the business's

24   overall star rating, which is created by Yelp will decline." *Id*. at 20-21. The latter theory of

25   unfairness is insufficiently pled for the reasons set forth above. As to the former theory, the SAC

26   fails to sufficiently allege a violation of the UCL's unfairness prong under either the *Cel-Tech* or

27   *South Bay* tests. Under *Cel-Tech*, plaintiffs point to no legislatively declared policy allegedly

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

contravened by Yelp, and the only statutes cited by the SAC relate to extortion. The allegations in the SAC also do not allege beyond a speculative level that Yelp's actions threaten competition, and there are no allegations from which the court could reasonably infer that Yelp is materially tilting the economic playing field in favor of plaintiffs' competitors. Under the *South Bay* test, it is impossible to balance the harms to plaintiffs against the benefits to Yelp based on the allegations in the SAC because (1) plaintiffs make little effort to quantify the extent to which they have been harmed by Yelp's user review manipulations, and (2) for the reasons explained above, the court is unable to reasonably attribute the appearance and disappearance of various user reviews to Yelp's wrongdoing as opposed to its efforts to filter out unreliable reviews. Moreover, although plaintiffs only obliquely set forth a theory of unfairness, it appears that the alleged unfair misrepresentations "sound in fraud" and therefore would be subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124, 1127 (9th Cir. 2009) (holding that the plaintiff's unfair practices claim was subject to Rule 9(b)). The SAC comes nowhere near setting forth sufficient specific facts that would satisfy this more rigorous standard.

IV.    Leave to Amend

The court should freely give leave to amend pleadings when justice so requires. Fed. R. Civ. P. 15(a)(2). Although the SAC fails to state a plausible claim for relief in its present form, plaintiffs' counsel represented at the motion hearing that continued investigation has produced additional facts that would bolster plaintiffs' allegations. The court is not persuaded that amendment would be futile and will provide plaintiffs with the opportunity to cure the deficiencies addressed above.

V.    Motion to Strike Class Allegations

Having determined that the SAC fails to state a plausible claim for relief, it is unnecessary at this juncture to address plaintiffs' class action allegations. If plaintiffs can set forth a viable further-amended complaint, the court will address the class allegations at a later date, if appropriate.

CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is GRANTED without prejudice. Any further amended complaint shall be filed within thirty (30) days of this order. Defendant shall file its answer within thirty (30) days of the filing of the amended complaint.

IT IS SO ORDERED.

Dated: March 22, 2011

_____

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1.  It is unclear why Levitt would need assistance "removing" a review, when he purportedly contacted Yelp to have a positive review reinstated.

2.  Yelp cannot be stripped of Section 230(c)(1) protection solely on the basis of alterations or minor changes to customer reviews, because such conduct is consistent with the traditional editorial functions protected by the CDA.  *See Roommates.com*, 521 F.3d at 1170; *Batzel v. Smith*, 333 F.3d 1018, 1031 ("The exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message.").  To the extent, however, that Yelp manipulates user reviews so as to change their "basic form and message" and accordingly contributes to the tortious conduct alleged, Section 230  does not apply.

3.  Section 230(c)(2) provides in full:

> (2) Civil liability. No provider or user of an interactive computer service shall be held liable on account of-(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

47 U.S.C. § 230(c)(2).

22