DAVID R. ONGARO, State Bar No. 154698
AMELIA D. WINCHESTER, State Bar No. 257928
ONGARO BURTT & LOUDERBACK LLP
595 Market St., Suite 610
San Francisco, CA  94105
Tel:  (415) 433-3900 Fax:  (415) 433-3950

Attorneys for Plaintiffs Boris Y. Levitt
*et al.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORIS Y. LEVITT D/B/A RENAISSANCE RESTORATION, CATS AND DOGS ANIMAL HOSPITAL, INC., TRACY CHAN D/B/A MARINA DENTAL CARE, and JOHN MERCURIO D/B/A WHEEL TECHNIQUES; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YELP! INC.; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. CV 10-01321 MHP<br>Consolidated with CV 3:10-cv-02351MHP<br><br>**THIRD AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR**<br><br>**1)  VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200;**<br><br>**2)  CIVIL EXTORTION; and**<br><br>**3)  ATTEMPTED CIVIL EXTORTION**<br><br>*Jury Trial Demanded* |

        Plaintiffs Boris Y. Levitt, d/b/a Renaissance Restoration, a/k/a Renaissance Furniture
Restoration ("Levitt" or "Plaintiff"), Cats and Dogs Animal Hospital, Inc. ("Cats and Dogs" or
"Plaintiff"), Tracy Chan, d/b/a Marina Dental Care, a/k/a Marina Dental Care ("Chan" or
"Plaintiff" ), and John Mercurio d/b/a Wheel Techniques ("Wheel Techniques" or "Plaintiff") on
behalf of themselves and all others similarly situated, file this class action Third Amended and
Consolidated Complaint (hereafter "TAC") against Defendant Yelp! Inc. ("Yelp" or "Defendant")
and Does 1 through 100, inclusive.

**<u>INTRODUCTION</u>**

1.      Plaintiffs bring this action on behalf of themselves and other similarly situated businesses and persons nationwide who were subject to extortion and/or attempted extortion by Defendant to obtain payments for advertising during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit.  This class action challenges Defendant's unfair and unlawful conduct – in violation of California's Unfair Competition Laws and liability for civil extortion and attempted civil extortion – directed towards businesses and their owners.

2.      Defendant's website allows users to post reviews of businesses.  Users are able to rank businesses using a star rating of one to five stars with five stars being the highest.  Defendant then gives the business an overall star rating based on some of the reviews.  Upon information and belief, the overall star rating of some businesses is based on reviews that Defendant has posted.  Defendant's website draws over 25 million people each month who are able to search for and review the public ratings of businesses.[1]

3.      Defendant's website represents that "Yelp is the fun and easy way to find, review, and talk about what's great – and not so great, in your area," that Yelp is "Real People. Real Reviews," and that its purpose is to "connect people with great local businesses."

4.      Defendant, however, actually makes money by selling advertisements to businesses located throughout the country.  Contrary to the representations Defendant makes to the general public, a business's reviews are often connected to whether a business advertises with Defendant.

5.      Defendant states on its website that advertising allows a business to increase its exposure by the placement of advertisements above Yelp search results and on related business pages.  Yelp also states that an advertising subscription allows a business to enhance its business page with a photo slideshow and prevents similar businesses from advertising on the middle of the page.  Yelp further states on its website that "[p]aying advertisers can also promote a favorite review at the top of their Yelp page, but can never change or re-order other reviews."  In addition,

---

[1]/ Defendant's website states that "[a]s of December 2009, more than 26 million people visited Yelp in the past 30 days."

Defendant states that, "Yelp has an automated filter that suppresses a small portion of reviews –it targets those suspicious ones you see on other sites."  Defendant offers businesses advertising subscriptions for amounts ranging from $300 to $1,200 per month.

6.      Defendant maintains that reviews may only be removed from Yelp if: 1) A user removes the review; 2) Yelp removes the review for violating the Terms of Service or Content Guidelines; or 3)  "The review may have been suppressed by Yelp's automated software system. This system decides how established a particular reviewer is and whether a review will be shown based on the reviewer's involvement on Yelp. While this may seem unfair to you, this system is designed to protect both consumers and businesses alike from fake reviews (i.e., a malicious review from a competitor or a planted review from an employee). *The process is entirely automated to avoid human bias,* and it affects both positive and negative reviews. It's important to note that these reviews are not deleted (they are always shown on the reviewer's public profile) and may reappear on your business page in the future"  [collectively "**Yelp Review Terms**"] (emphasis added).[2]

7.      Upon information and belief, Yelp will manipulate the reviews of businesses nationwide to instill fear in businesses that if they do not purchase advertising, Yelp will manipulate their reviews – in a manner that does not comply with its Review Terms  –  so that for example: 1) Positive reviews are "removed" or "filtered"; 2) negative reviews are suddenly posted, sometimes, upon information and belief, by Yelp itself or by individuals acting on behalf of Yelp; 3) negative reviews are posted by users even though the reviews do not comply with the Yelp Terms and Conditions; 4) a business is unable to designate itself in categories for Yelp users to search; or 5) negative reviews, which were previously filtered, are sometimes revealed or rearranged for reasons unrelated to the automated review filter.  Upon information and belief,

---

[2]/ Since the filing of this lawsuit, Yelp has permitted website users to see filtered reviews, however, website users must click on a separate link and type in a code to do so.  The filtered reviews do not impact the overall star rating that Yelp lists for the business.  Thus, upon information and belief, Yelp can edit the overall star rating a business receives by manually filtering (or un-filtering) reviews.

Yelp's manipulation of reviews – in a manner that does not comply with its own Review Terms – is done strategically, and in conjunction with or under the guise of the automated filter, to induce business owners to pay for advertising with Yelp.

8.      Upon information and belief, Yelp knows that when a business's overall star rating declines or the business has negative reviews, the business itself suffers, and that therefore a business fears the posting of negative reviews or the removal of positive reviews on its Yelp review page.  Yelp intentionally – either implicitly or explicitly – threatens businesses by using this fear to force businesses to agree to pay for advertising on Yelp.

9.      Due to Yelp's conduct, businesses and/or their owners who fear facing a negative drop in the overall star rating and/or positive reviews of their businesses agree to purchase advertising to avoid Yelp's manipulation of the business's reviews.  Those businesses are injured by the loss of money they are forced to pay Yelp in advertising costs.

10.      Upon information and belief, as a result of Yelp's review manipulations – in a manner that does not comply with its Review Terms – the businesses who decline to purchase advertising have negative reviews, which otherwise would not have been posted on the Yelp review page, attached to their businesses.  In addition, positive reviews are also removed to induce a business to advertise.  As a result, fewer Yelp users view the business page and fewer existing customers patronize the business, which causes a decrease in the business's revenues.  Therefore, the businesses that do not purchase advertising are injured – as a result of Defendant's conduct – by a loss of sales, revenues and/or assets.  In addition, due to the posting of negative reviews and/or removal of positive reviews, the business's reputation is injured.

11.      As a result of Yelp's actions, Plaintiffs bring a claim for a violation of California Business and Professions Code section 17200 for unfair and unlawful conduct by Defendant and for civil extortion and attempted civil extortion.

## THE PARTIES

12.      Plaintiff Boris Levitt, a resident of San Mateo County, owns and operates a business called Renaissance Furniture Restoration, which is located in San Francisco, California.

13.     Plaintiff Tracy Chan, a resident of San Mateo County, owns and operates a business called Marina Dental Care, which is located in San Francisco, California.

14.     Plaintiff Cats and Dogs Animal Hospital, Inc. is a California corporation with its principal place of business located in Long Beach, California.

15.     Plaintiff John Mercurio, a resident of Santa Clara County, owns and operates a business called Wheel Techniques, which is located in Santa Clara, California.

16.     Defendant Yelp! Inc. ("Yelp") is a Delaware corporation with its principal place of business located in San Francisco, California.  Yelp is licensed to do, and is doing business in California and throughout the United States.  At all relevant times, Yelp offered its services to businesses and persons nationwide and operated its business in California.

17.     Plaintiffs are unaware of the true names and capacities of DOES 1-100, inclusive, but are informed and believe, and thereon allege, that each of the DOE Defendants is responsible for the acts and obligations, and should be subject to and bound by the declarations and judicial determinations sought herein.  When Plaintiffs learn the true names and capacities of DOE Defendants, they will amend their TAC accordingly.

## VENUE AND JURISDICTION

18.     Jurisdiction and venue are proper in this Court as it was originally properly filed in the San Francisco County Superior Court because Defendant maintains its principal place of business in this county.  This matter was removed to the United States District Court for the Northern District of California pursuant to 28 U.S.C § 1331 *et seq*.  This court maintains removal jurisdiction over the matter because it was removed pursuant to 28 U.S.C § 1331 *et seq*.

## GENERAL ALLEGATIONS

### Yelp's Business Model

19.     At all relevant times, Defendant Yelp made its review and advertising services available to business owners nationwide.

20.     Upon information and belief, "Yelp.com," is a website developed, owned, maintained, altered, and operated by Defendant, as an internet application and website that utilizes

Web 2.0 user-website interaction.

21.    "Yelp.com" consists of an online search engine and directory of businesses.  Each business listed on Yelp.com has a unique Yelp.com listing page, which provides basic business information and user-generated ratings and reviews.  Once a business listing is created, individuals registered on the "Yelp.com" website may rate and review the business.

22.    To rate and review businesses, internet users simply register on the Yelp.com website.   When logged into his or her personal profile, the registered user is able to view reviews he or she has posted even if Yelp has removed them from the public review page for the business. Accordingly, the posting user may not realize that his or her review has been removed by Yelp.

23.     Any internet user (whether registered or not) can browse Yelp.com to find ratings and reviews of businesses.

24.    Ratings-based websites, including "Yelp.com," are highly popular and have great power to direct the flow of commerce in a given area.  Due to their widespread usage, a business's reputation is often connected to the reviews it receives on a ratings-based website.

25.    Businesses may not opt out of being listed on the "Yelp.com" website.

26.    Defendant allows businesses listed on the "Yelp.com" website to register for free "Business Owner Accounts," which provides owners with: 1) the ability to track how many people view their page; 2) the ability to update business information (such as hours of operation); and 3) a limited ability to send messages directly to a reviewer.

27.    Yelp further offers businesses with Yelp Business Owner Accounts the opportunity to designate the business under certain Yelp search categories.  Yelp users can then search for the business under the applicable category.

**Yelp Advertising**

28.    Upon information and belief, the "Yelp.com" website's only stream of revenue is from the sale of advertisements on the "Yelp.com" website and Yelp's sales personnel are paid, in part, through commissions.

29.    Yelp refers to businesses that purchase advertising as Yelp "Sponsors."

30.     The term "Non-Sponsor" as used in this TAC, refers only to those businesses to which Yelp offered paid advertising subscriptions, but which declined to purchase any advertising.

31.     Non-Sponsors routinely see positive reviews disappear from their Yelp.com listing pages soon after declining to become a Yelp Sponsor.

32.     Non-Sponsors routinely see an increase in the number of negative reviews on their Yelp.com listing pages soon after declining to become a Yelp Sponsor.

33.     Sometimes such negative reviews are false.  Examples of false reviews are reviews that concern services or goods not offered by the business, or purporting to be from customers or patients who never patronized the business.

34.     Upon information and belief such false negative reviews are sometimes generated by Yelp personnel or others who act on behalf of Yelp or at Yelp's direction, or who are compensated in some form by Yelp.  Although such false negative reviews violate Yelp's Terms of Service, Yelp regularly fails and refuses to remove such reviews for Non-Sponsors.

35.     The decline of their Yelp.com rating and the posting of false negative reviews harms Non-Sponsors.  Non-Sponsors frequently see a drop in the number of customers patronizing their businesses, and a decrease in income and profits.

36.     To coerce businesses to advertise with Yelp, Yelp sales people – either implicitly or explicitly – represent to businesses that Yelp has the power to manipulate Yelp.com business listing pages, and that Yelp will yield that power in favor of the business if it becomes a Yelp Sponsor and against the business if it declines to become a Yelp Sponsor.

37.     Upon information and belief, approximately 200 Yelp employees or individuals acting on behalf of Yelp have written reviews of businesses on Yelp.

38.     In fact, in the New York Times Bits Blog, dated May 12, 2008, Jeremy Stoppelman, Yelp's chief executive officer, admitted that Yelp has paid users to write reviews.  At the time of the posting, Mr. Stoppelman wrote, in explaining that Yelp does not pay "for reviews *directly* anymore" that  "in any of the 16 cities where we have community managers . . . we do not

pay for reviews.  Community managers in active communities are encouraged to review since they are model citizens…"[3]

39.     The mere representation of the ability to manipulate page content is sufficient to instill in businesses the fear that, through such manipulation, the business will suffer if it elects not to become a Yelp Sponsor.  Businesses frequently become Sponsors, not based on a cost-benefit analysis of the advertising, but simply because they fear the consequences of declining a Sponsorship.

40.     Yelp in fact manipulates Yelp.com business listing pages in favor of Yelp Sponsors and detrimentally to Yelp Non-Sponsors by (a) relocating or removing negative reviews of Sponsors; (b) posting positive reviews of Sponsors and urging others to do the same; (c) allowing Sponsors to choose the order in which reviews appear on their Yelp.com listing pages; (d) removing positive reviews of Non-Sponsors; (e) posting negative reviews of Non-Sponsors and urging others to do the same; and (f) enforcing Yelp's Terms of Service for Sponsors, but refusing to enforce Yelp's Terms of Service for Non-Sponsors.

41.     By manipulating the overall star rating of businesses, Yelp itself provides information and content posted on its website (namely the overall star rating of a business) because the overall star rating of a business does not represent the reviews posted by third-party users.  Upon information and belief, Yelp drafts the content of some reviews, either through its employees or through its Yelp Elite members or other agents – with malice to induce businesses to advertise – which also impacts the reviews of businesses.

**Plaintiffs' Experiences with Yelp**

**Non-Sponsors**

**Boris Levitt**

42.     Levitt owns a business called Renaissance Furniture Restoration.

43.     Levitt did not voluntarily list his business on Yelp.com.

_____

[3] Saul Hansell, *Why Yelp Works*, NEW YORK TIMES, May 12, 2008, http://bits.blogs.nytimes.com/2008/05/12/why-yelp-works/?apage=1.

44.     In early 2008, Levitt signed up for a free business account on Yelp.com.  After doing so, Levitt's business received several positive reviews and one negative review on Yelp.com.  In early May 2009, several of the positive Yelp reviews disappeared from Levitt's business's review page causing the overall star rating of Levitt's business to decline.

45.     On or about May 13, 2009, Levitt contacted Yelp to inquire about why a positive review of his business had disappeared.   Levitt subsequently exchanged several emails with "Kris" from Yelp User support, who indicated that she could not assist him in removing the review, but that she would send his request to the Yelp engineering team to review.

46.     In July 2009, Levitt was contacted twice by phone by a female Yelp sales representative who wanted Levitt to purchase advertising from Yelp.

47.     During the second telephone conversation, the sales representative told Levitt that his business was doing very well on Yelp because in July alone his business had 261 Yelp page views, but that Levitt's business would have an even greater number of Yelp page views if Levitt paid Yelp at least $300.00 a month to advertise.  In response, Levitt told the sales representative that he felt that he did not need to advertise on Yelp because there was a high volume of users reviewing his business page, and his business had an overall rating of 4.5 stars.  Levitt also asked the sales representative if Yelp could restore the 5-star reviews that had disappeared during last several months.

48.     At the time Levitt was contacted by the sales representative, he had seven 5-star reviews, one 4-star review, and one 1-star review.

49.     Two days after Levitt's conversation with Yelp's employees – during which he declined to purchase advertising – six out of the seven 5-star reviews were removed from his business page leaving Levitt with an overall star rating of 3.5 stars.  As a result, during the month of August, Levitt's business Yelp page received only 158 page views as opposed to the 261 page views Levitt's business experienced in July of 2009.  Levitt's monthly income declined in response.

50.     Upon information and belief, Yelp manipulated the reviews of Levitt's business because he did not purchase advertising as a threat and with the intent to instill fear in Levitt that he needed to purchase advertising to avoid a further decrease in the positive reviews posted about his business.

51.     As a result of Yelp's manipulations, Levitt's page views declined.  Due to the decline in the average or overall star rating of his business, the reputation of Levitt's business also suffered as result of Yelp's manipulations.

52.     To increase his overall star rating, Levitt attempted to contact the user who posted the one-star review.  While the user did not respond when Levitt contacted her through Yelp's messaging system, when contacted via Facebook, the user immediately removed the one-star review.  Upon information and belief, Yelp blocked Levitt's communications with the user to ensure that he would continue to fear that if he did not advertise, his overall star rating would remain low.

53.     In addition, in March 2010, Yelp removed Levitt's business from the multiple categories of services he had designated on his business account and restricted him to one category.  Upon information and belief, the category restriction was to further induce Levitt to pay Yelp for advertising, and if Levitt had advertised with Yelp, the restriction would have been lifted.

54.     After Levitt declined to purchase advertising from Yelp, every 5-star review posted on Levitt's Yelp business page was removed within 2-3 days after the Yelp user posted his or her review of Levitt's services.  As of the filing of Plaintiff's original Complaint, ten out of eleven of the 5-star reviews had been removed from Levitt's business's Yelp review page.  Upon information and belief, Yelp repeatedly removed positive reviews from Levitt's business Yelp review page to instill fear in him that if he did not pay Yelp to advertise, that Yelp would cause his business's overall star rating to remain low.

55.     As a result of Yelp's conduct, fewer Yelp users viewed Levitt's business's Yelp page and fewer customers patronized his business, which caused a decrease in Levitt's business revenues.  Therefore, Levitt was injured – as a result of Defendant's conduct – by a loss of sales,

1    revenues and/or assets.  In addition, due to the posting of negative reviews and/or removal of

2    positive reviews, Levitt's business's reputation was injured.

3                                    **Plaintiff Cats and Dogs**

4          56.     Dr. Perrault is a veterinarian and the owner of Cats and Dogs, which is located in

5    Long Beach, California.

6          57.     Dr. Perrault did not voluntarily list his business on Yelp.com.

7          58.     On September 12, 2009, Dr. Perrault became aware of a negative review posted by

8    "Chris R." on the Cats and Dogs Yelp.com listing page.

9          59.     Concerned about the review's language, possible falsity, and the adverse impact it

10   could have on his business, Dr. Perrault cross-referenced the factual information alleged in the

11   review with his client history.

12         60.     Upon finding that the review of Chris R. referenced a visit that occurred over 18

13   months prior to its posting (6 months outside of Yelp's 12-month policy), Javier Vargas, the

14   Hospital Manager at Cats and Dogs, called Yelp on or around September 15, 2009, to request that

15   the review be removed from the Yelp.com website for violating Yelp's review guidelines.

16         61.     Yelp subsequently removed the review from the Cats and Dogs Yelp.com listing

17   page.

18         62.     A second negative review, from "Kay K.," appeared on the Cats and Dogs

19   Yelp.com listing page within five days of the "Chris R." review's removal. The review read:

20         *The only reason I am even giving one star is because it wouldn't allow me to continue
           without it . . . otherwise, I would have given them no stars. Dr. Perrault is the rudest vet
21         I've ever been to . . . probably one of the rudest people I've had the displeasure of meeting.
           I agree with the previous reviews about making you feel like an unfit mom. My pup had
22         been sick and I had a theory on what the problem may have been and he wouldn't even
           entertain the idea, but instead, made me feel bad because my dog got sick. And, my poor
23         dog was terrified of him! He made me feel like I was 2 inches tall and repeatedly looked
           down his nose at me. Oh, and OVER PRICED! OMG! Who does he think he is??? I did not
24         feel welcomed by him nor his staff. I paid you for a service! No need to treat me so bad!*

25         63.     Soon after the appearance of these negative reviews, Dr. Perrault and Mr. Vargas

26   began receiving frequent, high-pressure calls from Yelp sales representatives, who promised to

27

28

manipulate Cats and Dogs' Yelp.com listing page in exchange for Cats and Dogs purchasing an advertising subscription.

64. For example, on or about January 5, 2010, Cats and Dogs received a Yelp sales call from "Kevin." Kevin said that Cats and Dogs could advertise with Yelp for a minimum payment of $300 per month, with a minimum 12-month commitment. Kevin stated that if Cats and Dogs purchased a one-year advertising subscription from Yelp:

a. Yelp would hide negative reviews on the Cats and Dogs Yelp.com listing page, or place them lower on the listing page so internet users "won't see" them;

b. Yelp would ensure negative reviews will not appear in Google and other search engine results;

c. Yelp would allow Cats and Dogs to decide the order that its reviews appear in on its Yelp.com listing page; and

d. Cats and Dogs could choose its "tagline," i.e., the first few lines of a single review shown on every search result page in which Cats and Dogs appears (for instance, "Veterinarian in Long Beach").

65. Dr. Perrault declined the offer, saying that he wanted to track referrals from Yelp for three months without ads, but might thereafter be willing to test Yelp's advertising potential.

66. Within a week of declining Kevin's advertising offer, the negative review from Chris R. – despite violating the Yelp Terms– suddenly reappeared on the Cats and Dogs Yelp.com listing page.

67. Upon information and belief, Yelp posted the review – despite the fact that it violated its own Terms – as a threat to cause Dr. Perrault to fear that if he did not pay Yelp money to advertise, the negative review would remain.

68. Soon after, "Kay K." posted a second negative review. This review was added on January 6, 2010, one day after Kevin's sales call:

*I've already left one review about how bad a vet Dr. Perrault is, but I wanted to add something. I've been reading other people's reviews and I must have gone to a different Cats and Dogs Animal Hospital with a vet named Dr. Perrault. Oh wait, no . . . he's the*

*only one. Maybe it's a Dr. Jeckyl / Mr. Hyde thing?! I don't know. But the guy's an @$$. No other way around it. He's a jerk, a D-Bag, And so arrogant. I ran in to him in a neighborhood store right after he saw my poor sick dog at his clinic and he looked right at me, recognized me, rolled his eyes and looked away!!!! Seriously, someone needs to knock this guy down to the size he really is. He needs to drop his Napolean complex and be a professional. After my horrible experience with him, I took my sick dog to Bixby Animal Clinic and I have never had a more pleasant vet experience! Go there instead! My dog loved everyone there! Sorry to rant, but I just wanted to get the word out there. Don't spend the money on this overpriced errogent vet. It's not worth it!*

69.     Upon information and belief, Yelp re-posted the "Chris R" and two "Kay K" reviews and/or manufactured its own reviews to instill fear in Dr. Perrault to advertise so that he could avoid the negative reviews and tagline.

70.     Compare Cats and Dogs' tagline to the tagline (as of January 18, 2010) of Bixby Animal Clinic, a Long Beach veterinary business that is a Yelp Sponsor (and the same company the mysterious Kay K. referred users to in her second Cats and Dogs review):

*"This place IS awesome. I brought my little man (Bruin) to Dr. A. as a puppy for the puppy package. They have great hours and were able to acommodate me AFTER work so I never had to take extra time . . . "*

71.     As a result of Yelp's conduct, fewer Yelp users viewed the Cats and Dogs Yelp page and fewer customers patronized the business, which caused a decrease in business revenues. Therefore, Cats and Dogs was injured – as a result of Defendant's conduct – by a loss of sales, revenues and/or assets.  In addition, due to the posting of negative reviews, Cats and Dogs' business's reputation was injured.

## John Mercurio

72.     Wheel Techniques is a wheel body shop and is owned by John Mercurio.

73.     Mercurio did not voluntarily list his business on Yelp.

74.     In or around late 2008 and early 2009, negative reviews started appearing on Wheel Technique's Yelp review page by reviewers who had never visited Wheel Techniques. Specifically, Wheel Techniques had no record of the names of the reviewers having visited the shop, or records of performing the work described in the reviews during or anywhere close to the time referenced in the reviews.

75.     For example, on March 5, 2009, "Kevin T" posted a one-star review of Wheel Techniques, but Wheel Techniques had no records of "Kevin T's" name in its system, and could not locate the type of problem he identified, regarding a weld job, on any invoice during or around the time period of "Kevin T's" review.

76.     Around the same time, Wheel Techniques also began receiving frequent telephone calls from Yelp requesting that it purchase advertising.

77.     Upon information and belief, Yelp employees or individuals acting on behalf of Yelp posted some or all of the false reviews on the Wheel Techniques Yelp review page prior to or soon after soliciting Wheel Techniques for advertising as a threat to induce Wheel Techniques to advertise.

78.     In 2009, Mercurio, perplexed at why Wheel Techniques maintained an overall star rating of 2.5 or 3 stars, called Yelp to inquire about why one of his competitors, known in the industry for its "shotty work," maintained an overall Yelp star-rating of five stars.  In response, Mercurio was told by Yelp that it was because his competitor advertised and that "we work with your reviews if you advertise with us."

79.     On or about March 8, 2010, Wheel Techniques was contacted by Yelp to purchase advertising.  At the time Wheel Techniques was contacted for advertising, a five-star review was listed at the top of its Yelp review page.

80.     Wheel Techniques declined to purchase advertising and expressed frustration with what it believed to be an advertising scam.  Within minutes, a one-star review was moved to the top of its Yelp review page.

81.     Upon information and belief, Yelp placed the one-star review at the top of the Wheel Techniques review page as a threat to cause Wheel Techniques to fear that if it did not pay Yelp money to advertise, the negative review would remain at the top of its Yelp review page and/or additional negative reviews would appear, and lower its overall star rating.

82.     Mercurio was told several times that a former Yelp employee stated that Yelp, upon information and belief, terminated a group of sales employees around the time that this and

1    similar lawsuits were filed as a result of scamming related to advertising.  Mercurio was also told

2    that the computers of sales employees were, at one point, frozen to prohibit employees from being

3    able to change reviews.

4         83.    As a result of Yelp's conduct, fewer customers patronized the business, which

5    caused a decrease in business revenues.  Therefore, Wheel Techniques was injured – as a result of

6    Defendant's conduct – by a loss of sales, revenues and/or assets and was recently forced to file for

7    bankruptcy.  In addition, due to the posting of negative reviews, Wheel Techniques business's

8    reputation was injured.  Wheel Techniques also, upon information and belief, lost large amounts

9    of business from insurance company referrals due to the negative reviews that were, upon

10   information and belief, posted by Yelp and/or the maintenance of a negative overall star rating due

11   to Yelp's manipulative conduct.

12                              **SPONSORS**

13                          **Dr. Tracy Chan, DDS**

14        84.    Dr. Tracy Chan is a licensed dentist.  Chan's office, Marina Dental Care, is located

15   in San Francisco, California.

16        85.    Chan did not voluntarily list her business on Yelp.com.

17        86.    Prior to spring 2008, Chan's business's overall Yelp star rating was approximately

18   4.5 or 5 five stars.  There were approximately 30 reviews on Dr. Chan's Yelp review page.

19        87.    In or around May or June of 2008, Chan started getting telephone calls from a Yelp

20   representative named Quinn Zimmerman ("Zimmerman").  Zimmerman would call Chan

21   frequently, offering her the opportunity to become a business sponsor.  Zimmerman told Chan that

22   if she became a business sponsor (i.e., paid for advertising on Yelp), that Yelp could offer her lots

23   of benefits, such as the opportunity to keep Chan's business ratings high by hiding or burying bad

24   reviews, and by keeping positive reviews at the top of the Marina Dental Care Yelp page and

25   negative reviews at the bottom of the page.  Further, Zimmerman indicated that Chan could put

26   pictures on the Yelp page, and track and increase the number of page views per month.

27        88.    In addition to the benefits Zimmerman offered Chan, Zimmerman told her that

28

---

THIRD AMENDED COMPLAINT                                                                      15
Case Nos. CV 10-01321 MHP; CV 10-02351 MHP

1    although many Yelp reviews were manipulated by a computer system, Yelp employees also had

2    the ability to remove reviews from a business's Yelp page.  Zimmerman offered Chan advertising

3    for between $300-$500 per month.

4       89.  In or around August 2, 2008, Chan ultimately declined to purchase Yelp

5    advertising from Zimmerman.

6       90.  Within 2 to 3 days of the time in which Chan told Zimmerman that she did not

7    want to purchase advertising from Yelp, Yelp removed nine 5-star reviews from Chan's Yelp

8    review page.  As a result, the overall star rating of Marina Dental Care dropped from 5 stars to 3

9    stars.

10      91.  After the drop in Marina Dental Care's overall star rating, Chan called Zimmerman

11   to attempt to determine why the drop in the star rating had occurred.  Zimmerman told Chan that

12   Yelp "tweaks" the ratings every so often and that he could help her if she signed up for advertising

13   services with Yelp.

14      92.  Upon information and belief, Yelp removed positive reviews of Chan's business as

15   a threat to cause Chan to fear that if she did not purchase advertising that her business's overall

16   star rating would stay low.  Chan – due to the representations made by Zimmerman and the

17   immediate decline in the reviews of her business – believed that Yelp manipulated Marina Dental

18   Care's reviews to induce her to advertise.

19      93.  As a result, and out of fear of further manipulations, Chan felt compelled to sign up

20   for advertising on Yelp so that Yelp would reinstate the positive reviews.  Chan feared that if she

21   did not pay for advertising, the posting of negative reviews would continue, and her business

22   would suffer.  On August 11, 2008, Dr. Chan signed a one-year contract with Yelp for advertising.

23   Within days of signing the contract, Marina Dental Care's overall star rating increased to 4 stars

24   and various five star reviews were reinstated by Yelp.  Upon information and belief, the positive

25   reviews were reinstated not because of Yelp's automated review filter (or because a user re-

26   posted), but because of Chan's purchase of advertising.

27

28

---

THIRD AMENDED COMPLAINT                 16
Case Nos. CV 10-01321 MHP; CV 10-02351 MHP

94.     In October 2008, Zimmerman asked Chan to start paying an increased payment of $500.00 a month to advertise with Yelp.  Chan said no, and in response, she noticed that her reviews were again declining.

95.     In October 2008, Chan – fed up with what she believed to be extortion – decided to cancel her Yelp advertising contract.  Following the termination of her contract, Yelp removed positive reviews on the Marina Dental Care Yelp page and replaced them with negative reviews.  Upon information and belief, Yelp's removal of positive reviews was not done pursuant to the Yelp Review Terms, but because Chan decided to terminate her advertising contract.  Upon information and belief, Yelp removed the positive reviews to cause Chan to fear that if she did not pay Yelp for advertising, Yelp would continue to remove positive reviews from her business's Yelp listing.

96.     In March 2009, after Yelp had – once again – removed several positive reviews, Chan attempted to post a negative review about Yelp's conduct towards her to the Marina Dental Care Yelp review page.  Within two to three days, Yelp removed six positive reviews – all of which were 4 or 5-star ratings – from the Marina Dental Care Yelp page.  As a result, the Marina Dental Care overall Yelp star rating fell to 3 stars.  Upon information and belief, Yelp's removal of the positive reviews was not done pursuant to the Yelp Review Terms, but to induce Chan to pay for advertising and/or to retaliate against her to discourage her from posting negative information about Yelp.

97.     In May 2010, Chan posted a negative review about Yelp to her own website.  Within two days, Yelp removed six positive reviews from the Marina Dental Care Yelp page dropping the overall star review of Chan's business from 4 stars to 3.5 stars.

98.     That same month, Chan wrote a letter to Yelp, which described her experiences.  In response, Yelp removed additional positive ratings from the Marina Dental Care Yelp page and the Marina Dental Care overall star rating fell to 2.5 stars.  Upon information and belief, Yelp's removal of the positive reviews was not done pursuant to the Yelp Review Terms, but to induce

Chan to pay for advertising and/or to discourage her from posting negative information about Yelp.

99.     Thereafter Chan called Yelp's New York office to inquire about Yelp's automated review system and spoke with "Paul." Paul stated that the review process was all automated, but when pressed, Paul admitted to Chan that Yelp manually adds and removes reviews based on its own discretion. He also admitted that Yelp's primary revenue stream is from Sponsors.

100.    As of spring 2010, Yelp had filtered 77 reviews of Chan's office, 75 of which were positive reviews, meaning that the positive reviews were not factored into Chan's office's overall star rating on Yelp. Upon information and belief, the filtering was not done by entirely by the automated filter, but primarily by Yelp as an attempt to threaten Chan so that she would pay for advertising with Yelp.

101.    As a result of Yelp's manipulation of the Marina Dental Care reviews, Chan lost money in advertising costs she paid to Yelp to avoid Yelp's manipulation of the reviews of her business in a manner that did not comply with the Yelp Review Terms. Chan also experienced a decline in new patients that corresponded almost directly to the decline in Yelp star ratings.

102.    In addition and as a result of Yelp's conduct, fewer Yelp users viewed Chan's business's Yelp page and fewer patients patronized her business, which caused a decrease in Chan's business revenues. Therefore, Chan was injured – as a result of Defendant's conduct – by a loss of sales, revenues and/or assets. In addition, due to the posting of negative reviews and/or removal of positive reviews, Chan's business's reputation was injured.

**Other Businesses and Persons' Experiences with Yelp**

103.    Upon information and belief, Defendant manipulated the reviews for hundreds or thousands of other businesses before and/or after a Yelp customer service representative spoke to a person or business about advertising on Yelp. Upon information and belief, Defendant manipulated the reviews, under the guise of or in conjunction with its automated filter, to cause fear in businesses or persons that if they did not purchase advertising, Yelp would cause negative reviews to appear or positive reviews to disappear, which would, in turn, decrease the overall star

1    rating of the business or person and cause it to incur a decrease in sales, assets, profits, and/or

2    revenues, harm to the business's or person's reputation, and a loss in advertising costs.[4]

3    Defendant's conduct impacted businesses and persons located nationwide and therefore impacted

4    interstate commerce.

### CLASS ACTION ALLEGATIONS

5

6        104.    Plaintiffs bring this action on behalf of themselves and all others similarly situated,

7    pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

8        105.    The subclasses that Plaintiffs seek to represent are defined as follows:

9      a) **Non Sponsors**:  All similarly situated businesses and persons nationwide who were in

10         contact with Yelp regarding the option to advertise on Yelp, declined to purchase

11         advertising, and as a result of not purchasing advertising, were subject to the

12         manipulation of the reviews of their businesses by Yelp – in a manner that did not

13         comply with Yelp's representations regarding its Review Terms[5]  –  during the four

14         years prior to the commencement of this lawsuit, through the final resolution of this

15         lawsuit.

16     b) **Sponsors:** All similarly situated businesses and persons nationwide who were in

17         contact with Yelp regarding the option to advertise on Yelp, whose reviews were

18         manipulated by Yelp in a manner that did not comply with Yelp's representations

19    _____

20        [4]/ Many stories have been published that describe similar allegations relating to Yelp's
     conduct.  *See e.g. Yelp and the Business of Extortion 2.0*, available at
21    http://www.eastbayexpress.com/eastbay/yelp-and-the-business-of-extortion-
     20/Content?oid=1176635; *see also* http:www.yelp.com/biz/yelp-san-francisco.
22

23        [5] For purposes of both subclass definitions, Review Terms means, as set forth in the
     complaint, Yelp's public representation that reviews may only be removed from Yelp if: 1) A user
24    removes the review; 2) Yelp removes the review for violating the Terms of Service or Content
     Guidelines; or 3)  "The review may have been suppressed by Yelp's automated software system.
25    This system decides how established a particular reviewer is and whether a review will be shown
     based on the reviewer's involvement on Yelp. While this may seem unfair to you, this system is
26    designed to protect both consumers and businesses alike from fake reviews (i.e., a malicious review
     from a competitor or a planted review from an employee). The process is entirely automated to
27    avoid human bias, and it affects both positive and negative reviews. It's important to note that these
     reviews are not deleted (they are always shown on the reviewer's public profile) and may reappear
28    on your business page in the future."

_____

regarding its Review Terms and who thereafter purchased advertising during the four years prior to the commencement of this lawsuit, through the final resolution of this lawsuit ("**Sponsors**").

106.    This action has been brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

107.    Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

108.    Numerosity:  The Class is so numerous and geographically dispersed that joinder of all Class members is impracticable.  Upon information and belief, there are hundreds, if not thousands, of similarly situated businesses and persons nationwide.

109.    Commonality:  This action presents questions of law and fact common to the members of the Class which predominate over questions affecting individual members of the Class.  Such questions of law or fact include, but are not limited to:

a)    Whether Defendant unlawfully committed extortion, and/or attempted extortion, as a predicate for a violation of California Business & Professions Code § 17200 *et seq.*;

b)    Whether Defendant unfairly manipulated the reviews of businesses of Plaintiffs and the Class to encourage them to advertise in violation of California Business & Professions Code § 17200 *et seq.*;

c)    Whether Defendant is liable for civil extortion to Plaintiffs and the Class; and

d)    Whether Defendant is liable for attempted civil extortion to Plaintiffs and the Class.

110.    Typicality:  Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs have no interests that are adverse or antagonistic to the interests of the other members of the Class.

111.    Adequacy of Representation:  Plaintiffs will fairly and adequately protect the interests of the other members of the Class.  Plaintiffs are committed to prosecuting this Class Action and have retained competent counsel experienced in litigation of this nature.

112.    Superiority of Class Action:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all Class Members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.  Class members have been damaged and are entitled to recovery by reason of Defendants' unfair and unlawful business practices.  Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

113.    Class treatment is appropriate and individualized inquiries will not be necessary because, upon information and belief, Yelp's computer software and records will show 1) which class members were contacted for advertising; 2) whether the class members' reviews were manipulated in a manner that did not comply with the Yelp Review Terms; 3) whether the class member did or did not purchase advertising and/or upgrade its advertising package; and 3) whether, in response, the reviews of the class member's business were manipulated in a manner that did not comply with the Yelp Review Terms.

## FIRST CAUSE OF ACTION

(Violation of Business & Professions Code § 17200 *et seq.*)

(Sponsors and Non-Sponsors v. Defendant)

114.    Plaintiffs incorporate by reference paragraphs 1 through 113 inclusive, as though fully set forth herein.

115.    Plaintiffs assert this cause of action on behalf of themselves and the Class.

116.    California Business & Professions Code § 17200 *et seq.* prohibits unfair competition that is an unfair or unlawful business practice.

117.    Defendant threatened to or did manipulate the reviews, and overall star ratings, of businesses and/or persons – in a way that did not comply with its own Review Terms – to cause

fear in businesses and/or their owners that if they did not pay Yelp for advertising, Yelp would manipulate the reviews of their business in a way that would cause them financial harm and harm to their business' reputations.

118.    As a result, Defendant unlawfully attempted to and/or did in fact commit extortion, as set forth in California Penal Code sections 518, 519, 523, 524, the Hobbs Act, civil extortion and civil attempted extortion by intentionally and unlawfully using fear (the removal of positive reviews and/or the addition or manipulation of negative reviews by implicit or explicit threats to cause injury to Class members' businesses) to induce the Class members to consent to pay Defendant for advertising.

119.    Defendant's conduct is unfair and harms competition by favoring businesses that submit to Yelp's manipulative conduct and purchase advertising to the detriment of competing businesses that decline to purchase advertising and have their reviews negatively manipulated by Yelp.

120.    Defendant's conduct further constitutes unfair competition because the harm caused by Defendant's manipulation of Class members' reviews to class members, including damage caused to their sales, revenues and/or assets and business reputations, greatly outweighs any benefit to Defendant in advertising sales.  Any reason, justification and/or motive for Yelp's manipulations of Class members' reviews does not justify the substantial financial and reputational harm businesses have suffered.

121.    In addition, the harm to class members caused by Defendant's conduct, which includes threats, retaliation, extortion and/or attempted extortion, is substantially injurious to consumer class members, and constitutes unfair competition.  Class members have lost sales, profits, revenues, assets, advertising payments, and their business reputations have been harmed due to Defendant's conduct.  Defendant's actions have devastated businesses that are struggling to survive in today's economy.

122.    Defendant's conduct towards Class members – most of whom did not choose to be on Yelp in the first place – is also immoral and unethical.

123.    Both Plaintiffs and the Class have been deprived of money, either in the form of lost business revenues and/or assets or in payments made to Defendant for advertising, as a result of Defendant's wrongful conduct and unlawful acts and practices.  Plaintiffs and the Class members, therefore, have sustained injury in fact.

124.    As a result, Sponsor Class members were injured in the form of advertising payments they made to Defendants, and are entitled to restitution.

125.    Sponsor Class members are entitled to equitable and injunctive relief in the form of restitution and disgorgement of all earnings, profits, compensation and benefits Defendants obtained as a result of such unfair and unlawful business practices.  Defendant has been unjustly enriched by receiving substantial monies and profits from advertising payments made by Plaintiffs and the Class to avoid negative manipulations of their reviews.

126.    For Non-Sponsor Class members, Defendants took a direct ineffectual step towards committing extortion by attempting to make the Class members fear that if they did not purchase advertising, their overall star rating and/or public reviews would decline.

127.    Non-Sponsor Class members were injured by Defendant's conduct by the harm caused to the reputations of their businesses, a decline in their business assets and profits, and goodwill.  As such, they are entitled to injunctive relief.

128.    Plaintiffs and members of the Class seek a court order requiring Defendant to immediately cease such violations of consumer protection and unfair competition statutes and enjoining Defendant from continuing to conduct business via the unlawful or unfair business acts and practices complained of herein.

129.    Plaintiffs additionally request an order requiring Defendant to disgorge its ill-gotten gains as described above and awarding Sponsor Class Members full restitution of all monies wrongfully acquired by Defendant by means of such unlawful business practices and acts of unfair competition, plus interest and attorney fees so as to restore any and all monies to Plaintiffs and the Class that were acquired and obtained by means of such unfair and unlawful business practices.

130.   These violations serve as unlawful predicate acts for purposes of Business and Professions Code § 17200, and remedies are provided therein under Business & Professions Code § 17203.

## SECOND CAUSE OF ACTION

(Civil Extortion)

(Sponsors and Non-Sponsors v. Defendant)

131.   Plaintiffs incorporate by reference paragraphs 1 through 130 inclusive, as though fully set forth herein.

132.   Defendant obtained property from Plaintiff Chan and the Sponsor Class members - with their consent - in the form of advertising payments.

133.   Defendant attempted to obtain property from Plaintiffs Levitt, Cats & Dogs, Mercurio and Non-Sponsor Class members in the form of advertising payments.

134.   Defendant wrongfully threatened to or did manipulate the reviews, and overall star ratings, of businesses and/or persons – in a way that did not comply with its own Review Terms – to cause fear in businesses and/or their owners that if they did not pay Yelp for advertising, Yelp would manipulate the reviews of their business in a way that would cause them financial harm and harm to their business' reputations.

135.   As a result, Defendant unlawfully committed civil extortion by intentionally and unlawfully using fear (the removal of positive reviews and/or the addition or manipulation of negative reviews by implicit or explicit threats to cause injury to Class members' businesses) to induce the Class members to consent to pay Defendant for advertising.

136.   As a result, Sponsor Class members were harmed by paying advertising payments to Defendant as a result of the threats, and are entitled to damages in an amount to be proven at trial.

137.   For Non-Sponsor Class members, Defendant took a direct ineffectual step towards committing extortion by attempting to make the Class members fear that if they did not purchase advertising, their overall star rating and/or public reviews would decline.

138.    Non-Sponsor Class members were injured by Defendant's conduct by the harm caused to the reputations of their businesses, a decline in their business assets and profits, and goodwill, and are entitled to damages in an amount to be proven at trial.

139.    The acts of Defendant were so outrageous, willful, wanton and in reckless disregard to Plaintiffs and the Class as to entitle Plaintiffs and the Class to punitive damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

(Attempted Civil Extortion)

(Non-Sponsors v. Defendant)

140.    Plaintiffs incorporate by reference paragraphs 1 through 139 inclusive, as though fully set forth herein.

141.    Defendant attempted to obtain property from Plaintiffs Levitt, Cats & Dogs, Mercurio and Non-Sponsors in the form of advertising payments.

142.    Defendant wrongfully threatened to or did manipulate the reviews, and overall star ratings, of businesses and/or persons – in a way that did not comply with its own Review Terms – to cause fear in businesses and/or their owners that if they did not pay Yelp for advertising, Yelp would manipulate the reviews of their business in a way that would cause them financial harm and harm to their business' reputations.

143.    As a result, Defendant unlawfully committed attempted civil extortion by intentionally and unlawfully using fear (the removal of positive reviews and/or the addition or manipulation of negative reviews by implicit or explicit threats to cause injury to Class members' businesses) to induce the Class members to consent to pay Defendant for advertising.

144.    For Non-Sponsor Class members, Defendant took a direct ineffectual step towards committing extortion by attempting to make the Class members fear that if they did not purchase advertising, their overall star rating and/or public reviews would decline.

145.    Non-Sponsor Class members were injured by Defendant's conduct by the harm caused to the reputations of their businesses, a decline in their business assets and profits, and goodwill, and are entitled to damages in an amount to be proven at trial.

146.    The acts of Defendant were so outrageous, willful, wanton and in reckless disregard to Non-Sponsors as to entitle Non-Sponsors to punitive damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, as a result of the foregoing, Plaintiffs pray for relief as follows:

1.    Declaring this action to be a proper class action maintainable under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), certifying appropriate subclasses and certifying Plaintiffs as Class Representatives;

2.    Enjoining Defendant from conducting its business through the unlawful acts and practices described in this Complaint;

3.    Requiring Defendant to disgorge its ill-gotten gains, as appropriate;

4.    Awarding restitution, as appropriate;

5.    Awarding pre- and post-judgment interest;

6.    Awarding damages in an amount to be proven at trial;

7.    Awarding punitive damages in an amount to be proven at trial;

8.    Awarding Plaintiffs all costs and expenses, including attorneys' fees, fees permitted under California Code Civil Procedure section 1021 *et seq.*; and

9.    Granting such other and further relief as this Court may deem necessary, proper, and/or appropriate.


DATED:  May 23, 2011                    **ONGARO BURTT & LOUDERBACK LLP**



                                        By:  */s/ David R. Ongaro*
                                             David R. Ongaro
                                             Attorneys for Plaintiff Boris Y. Levitt *et al.*